# United States Court of Appeals
## For the First Circuit

No. 05-2160

MICHAEL D. MULLOY,

Plaintiff, Appellant,

v.

ACUSHNET COMPANY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Selya, Lynch, and Lipez, Circuit Judges.

Richard E. Burke, Jr., with whom James Hodgson and Law Offices of Beauregard, Burke & Franco were on brief, for appellant.
Laurence J. Donoghue, with whom Corinne L. Hood and Morgan, Brown & Joy, LLP were on brief, for appellee.

August 24, 2006

**LIPEZ**, **Circuit Judge**.   Appellant Michael D. Mulloy appeals from the entry of summary judgment for his former employer, Acushnet Company, in a suit alleging disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213, and the Massachusetts anti-discrimination statute, Mass. Gen. Laws ch. 151B, § 4.   Mulloy contends that Acushnet failed to accommodate his disability when it refused to allow him to work from a remote location.   The district court held that Mulloy was not a "qualified individual with a disability" under the ADA or a "qualified handicapped person" under Chapter 151B, § 4. We affirm.

## I.

The following facts are undisputed except as otherwise noted.   Acushnet, headquartered in Fairhaven, Massachusetts, manufactures and sells golf balls and other golf equipment and accessories.   It has several manufacturing facilities, including a facility in Dartmouth, Massachusetts ("Ball Plant II").   In December of 1998, Acushnet hired Michael Mulloy as one of two electrical engineers at Ball Plant II.

The golf ball manufacturing process uses materials containing chemical sensitizers known as isocynates.   The parties disagree as to the hazards of isocynate exposure:   according to Acushnet, exposure to isocynates may exacerbate the symptoms of those with asthma, allergies, or chronic respiratory problems,

while Mulloy believes isocynate exposure may cause these conditions. All of Acushnet's manufacturing facilities use isocynates. As a result, Acushnet has developed a formal isocynate protocol "[t]o ensure the safe placement of any associate in an area with isocynate exposure and to provide ongoing medical monitoring post exposure to isocynates."

From December 1998 through January 2001, Mulloy designed programs for the golf ball manufacturing machines (governing their movement and timing); specified, purchased, and supervised the installation of electronic controls for new and modified equipment; evaluated machine capabilities and identified mechanical and electrical changes; trained and supported maintenance personnel to "troubleshoot" (i.e., respond to malfunctions with) electrical and electronic controls; supported electrical safety programs; and specified electrical services for new machines. During this period, Mulloy spent an average of two hours per day on the manufacturing floor, and another six hours per day in his cubicle away from the manufacturing floor. Some days, Mulloy spent all or a majority of his day on the plant floor. The parties disagree about whether Mulloy sometimes worked on the plant floor for a full week or more at a time.

At the time of his hire, Mulloy completed a medical history form, reporting that he had no allergies, was taking no medication, and had no prior exposure to isocynates. Nine months

later, however, Mulloy began to experience throat and chest tightness and discomfort, and presented Acushnet with a note from his physician reporting these symptoms. Acushnet responded by taking steps under its isocynate protocol, which involved Mulloy's completion of an allergy questionnaire and his taking a pulmonary function test. Dr. Charles Lutton, Acushnet's occupational medicine consultant, examined Mulloy and referred him to a respiratory specialist, who noted no signs of isocynate sensitivity and cleared him to return to work.

On May 9, 2000, while working in the paint spray room (where golf balls are spray painted), Mulloy began to feel dizzy. Over the next several days, he felt "foggy and feverish." Acushnet kept Mulloy out of the paint spray room pending further pulmonary function testing and examination by Dr. Lutton. Dr. Lutton recommended that Mulloy not be exposed to isocynates or another respiratory irritant, CX-100. Accordingly, Mulloy was restricted from areas in the plant where these irritants are generated, known as "red zones," and was reassigned to work on machines outside of the red zones on the other side of the building, in areas of the plant such as "core molding" (where the rubber cores of golf balls are made). When Mulloy needed to work on machines in the red zones, he did so remotely from the other side of the building by relying on other personnel to download his programs into these machines located in the restricted areas.

This arrangement worked for over a year. However, beginning in November 2001, Mulloy began to experience dizziness and other symptoms while outside of the red zones. Dr. Lutton examined Mulloy and recommended that he be removed from all Acushnet buildings where isocynates were used. Accordingly, Acushnet transferred him to its headquarters in Fairhaven, Massachusetts, located fifteen miles away from Ball Plant II, where there is no manufacturing and no use of chemicals such as isocynates.

The parties disagree about the extent to which Mulloy continued to perform his job functions in Fairhaven. Mulloy contends that he continued to perform all of his job functions in Fairhaven, and even received a positive job performance evaluation three months after his transfer. Acushnet contends that while Mulloy was able to perform some of the functions of his job, his inability to enter the plant prevented him from performing others. Following his transfer to Fairhaven, the Vice President of Employee Relations, Ken Riall, consulted with Acushnet's Vice President of Golf Ball Manufacturing, Eric Bartsch, and its Director of Health Safety and Field Services, Jean Sutherland, regarding what tasks Mulloy could perform and what accommodations could be made for his limitations. Riall specifically asked Bartsch whether Mulloy could perform his job remotely. Bartsh concluded that Mulloy could not. Riall did not consult with Kimberly Francis, the Director of

Engineering at Ball Plant II and Mulloy's immediate supervisor. On January 10, 2002, Acushnet told Mulloy that his employment would be terminated effective March 4, 2002.

Approximately 50% of the work that Mulloy used to perform is now done by Acushnet employees inside the plant. Due to a shortage of personnel, another 40% of the work Mulloy used to perform is handled by outside vendors, and the majority of this work (70%) is likewise performed inside the plant. A small percentage of the work (10%) that Mulloy used to perform has been designated low-priority by Acushnet and, therefore, is not being done.

Since his termination from Acushnet, Mulloy has been diagnosed with occupational asthma. The parties disagree about the extent of the limitations imposed by this diagnosis. Mulloy contends that he is "permanently partially disabled" and can work only in a "meticulously clean work environment because exposure to dusts and numerous common chemical compounds . . . can trigger a respiratory attack." Acushnet argues that, based on the medical evidence, Mulloy need only avoid working in areas containing isocynates or other volatile chemicals. Mulloy also contends that he sustained emotional and psychological damage as a result of his termination which may preclude him from future employment.

For several years following his termination, Mulloy sought employment as an electrical engineer and also considered

other job options such as teaching, to no avail. He eventually enrolled as a full-time student at Syracuse Law School. On May 28, 2003, Mulloy filed a complaint in the district court, alleging that Acushnet discriminated against him on the basis of his disability in violation of the ADA and Chapter 151B, § 4. Acushnet subsequently filed a motion for summary judgment, which the district court granted. This appeal followed.

**II.**

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original). "For the purposes of summary judgment, 'genuine' means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a 'material fact' is one which 'might affect the outcome of the suit under the governing law.'" Seaboard Sur. Co. v. Town of Greenfield, 370 F.3d 215, 218-19 (1st Cir. 2004) (internal quotation marks and citation omitted).

"The scope of appellate review of entry of summary judgment in ADA cases, as in all others, is de novo." EEOC v. Amego, Inc., 110 F.3d 135, 141 (1st Cir. 1997). While we "constru[e] the record in the light most favorable to the nonmovant and resolv[e] all reasonable inferences in that party's favor[,] . . . we can safely ignore conclusory allegations, improbable inferences, and unsupported speculation." Carroll v. Xerox Corp., 294 F.3d 231, 237 (1st Cir. 2002) (internal quotation marks and citation omitted). In so doing, "[w]e are not wed to the lower court's rationale but, rather, may affirm the entry of summary judgment on any ground made manifest by the record." Okmyansky v. Herbalife Int'l of America, Inc., 415 F.3d 154, 158 (1st Cir. 2005).

## III.

### A.        The ADA

The ADA prohibits discrimination against "a qualified individual with a disability" -- that is, "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires" -- "based on that disability." 42 U.S.C. §§ 12111(8), 12112(a). In order to establish a claim under the ADA, a plaintiff must prove the following three elements by a preponderance of the evidence: first, that she is disabled within the meaning of the ADA, i.e., that she has "a physical or

-8-

mental impairment that substantially limits one or more [] major life activities," 42 U.S.C. § 12102(2); "second, . . . that with or without reasonable accommodation she was a qualified individual able to perform the essential functions of the job; and third, . . . that the employer discharged her because of her disability." García-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 646 (1st Cir. 2000) (internal citation and quotation marks omitted).

**B.        The District Court Proceeding**

The district court held that Mulloy's disability claim failed to satisfy both the first and second elements of the ADA.[1] Under the first element, the district court held that Mulloy failed to "present[] sufficient evidence to survive summary judgment on the issue of 'substantial impairment' either of breathing or of working." Mulloy, 2005 WL 1528208, at *5. With respect to the major life activity of breathing, the district court held that "[Mulloy was] not symptomatic most of the time," and that "[i]t is not sufficient . . . simply to have intermittent responses to particular irritants." Id. As for the major life activity of working, the district court held that "it is a particular job at a

---

[1] Relying on our authority that Chapter 151B, § 4 "tracks the ADA in virtually all respects," Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 21 n.5 (1st Cir. 2002), the district court did not separately analyze Mulloy's claim under Chapter 151B, § 4. See Mulloy v. Acushnet Co., No. Civ.A. 03-11077-DPW, 2005 WL 1528208, at *1 n.1 (D. Mass. June 20, 2005). We analyze the state law claim later in this opinion, see infra Part III(D).

particular location for which [Mulloy's] breathing difficulties create an impairment," and that "it is not enough to show that an individual is substantially limited in his ability to perform his particular job." Id. at *4.

Turning to the second element of the ADA,[2] the district court held that Mulloy was not an otherwise qualified individual capable of performing the essential functions of his job with or without reasonable accommodation. Specifically, the district court found that "it is essential not only that [Mulloy] interact with those for whom he has responsibility [for] training and supporting, but also that he interact . . . with machines found in the plant." Id. at *9. These essential functions, the district court held, "require [Mulloy's] physical presence" in Ball Plant II. Id. at *10.

Since the only accommodation proposed by Mulloy -- i.e., working from a remote location -- "inherently vitiate[d] [Mulloy's]

---

[2] While the district court could have ended its analysis after deciding that Mulloy failed to satisfy the first element of the ADA, the district court turned to the second element "[i]n the interests of completeness and recognizing that the law of substantial impairment -- at least to 'working' -- is not yet completely settled." Mulloy, 2005 WL 1528208, at *5. The district court's comment is understandable. Compare Sutton v. United Air Lines, Inc., 527 U.S. 471, 492 (1999) (noting "some conceptual difficulty in defining 'major life activities' to include work" under the ADA), with Guzmán-Rosario v. United Parcel Serv., Inc., 397 F.3d 6, 11 (1st Cir. 2005) ("Awaiting a definitive ruling from the Supreme Court otherwise, we have assumed that 'working' is a major life activity."), and Mass. Gen. Laws, ch. 151B, § 1(20) (including "working" among "major life activities").

ability to perform essential functions," the district court concluded that it was not reasonable.  Id.  Such an accommodation, the district court stated, "in essence requires not an accommodation but a redefinition of his job."  Id.  Even assuming that technological aids such as a web camera "might permit [Mulloy] to do his job from another location," the district court concluded that such an accommodation would necessitate the hiring of an additional employee to man the camera, and would thus impose an undue hardship on Acushnet.  Id.

C.        **Application of the ADA**

### 1.    First Element:  Substantial Limitation of a Major Life Activity

Mulloy argues that he is disabled under the ADA because his occupational asthma substantially limits his ability to breathe and work.[3]  Acushnet argues that Mulloy is not "disabled" because "his breathing was only affected at a particular job at a particular location" and, with respect to the major life activity of working, he "did not show that he was limited from a broad range or class of jobs."  We need not decide whether Mulloy was disabled within the meaning of the ADA.  The second element of an ADA claim -- i.e., whether Mulloy was a qualified individual capable of

_____

[3] For argument's sake, we assume that "working" is a "major life activity" under the ADA.  See Guzmán-Rosario, 397 F.3d at 11. Unlike the ADA, Chapter 151B, § 1(20) of the General Laws of the Commonwealth of Massachusetts includes "working" among "major life activities".

-11-

performing the essential functions of his job with or without reasonable accommodation -- provides a sufficient basis for the decision. We therefore assume without deciding that Mulloy was disabled under the ADA.

2. **Second Element: Qualified Individual Capable of Performing Essential Functions With or Without Reasonable Accommodation**

"In order to be a 'qualified individual' under the Act, the burden is on the employee to show: first, that she possesses the requisite skill, experience, education and other job-related requirements for the position, and second, that she is able to perform the essential functions of the position with or without reasonable accommodation." García-Ayala, 212 F.3d at 646 (internal citation, quotation marks, and brackets omitted); see also 29 C.F.R. § 1630.2(m). There is no dispute that Mulloy satisfies the first of these requirements.

Turning to the second requirement, we must analyze "whether the individual can perform the essential functions of her position" without reasonable accommodation; and if not, whether "any reasonable accommodation by her employer would allow her to do so." Phelps v. Optima Health, Inc., 251 F.3d 21, 25 (1st Cir. 2001). "An 'essential function' is a fundamental job duty of the position at issue . . . [it] does not include the marginal functions of the position." Kvorjak v. Maine, 259 F.3d 48, 55 (1st Cir. 2001) (citing 29 C.F.R. § 1630.2(n)(1)) (internal citations

-12-

omitted). Evidence of whether a particular function is essential includes, but is not limited to: "[t]he employer's judgment as to which functions are essential"; "[w]ritten job descriptions prepared before advertising or interviewing applicants for the job"; "[t]he work experience of past incumbents in the job"; and "[t]he current work experience of incumbents in similar jobs." 29 C.F.R. § 1630.2(n)(3); see also Kvorjak, 259 F.3d at 55. In the absence of evidence of discriminatory animus, "we generally give substantial weight to the employer's view of job requirements." Ward v. Mass. Health Research Inst., Inc., 209 F.3d 29, 34 (1st Cir. 2000). In other words, our inquiry into essential functions "is not intended to second guess the employer or to require the employer to lower company standards." Mason v. Avaya Communications, Inc., 357 F.3d 1114, 1119 (10th Cir. 2004); see also 29 C.F.R. app. § 1630 ("It is important to note that the inquiry into essential functions is not intended to second guess an employer's business judgment with regard to production standards, whether qualitative or quantitative, nor to require employers to lower such standards.").

A "reasonable accommodation" is one which "would enable [the plaintiff] to perform the essential functions of her job [and] . . . at least on the face of things . . . is feasible for the employer under the circumstances." Reed v. LePage Bakeries, Inc., 244 F.3d 254, 259 (1st Cir. 2001); see also 29 C.F.R. §

1630.2(o)(1)(ii) ("The term reasonable accommodation means . . . [m]odifications or adjustments to the work environment . . . that enable a qualified individual with a disability to perform the essential functions of that position."). An employer who fails to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" violates the ADA, "unless [the employer] can demonstrate that the accommodation would impose an undue hardship" -- financial or otherwise -- "on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

Before we proceed further with the analysis of Mulloy's claim that Acushnet should have allowed him to work at a remote location, we must decide whether the ADA requires us to evaluate this claim as an essential function issue or as a reasonable accommodation issue. Courts have treated the issue both ways. Compare Mason, 357 F.3d at 1122 ("[T]he district court properly held Mason's physical attendance at the administration center was an essential function of the service coordinator position because the position required supervision and teamwork."), and Hypes v. First Commerce Corp., 134 F.3d 721, 727 (5th Cir. 1998) ("[R]egular attendance is an essential function of most jobs."), with Kvorjak, 259 F.3d at 54 ("The particular question we face here is whether appellant can 'perform the essential functions of the position' if given the accommodation he seeks, working at home."), and Smith v.

-14-

Ameritech, 129 F.3d 857, 867 (6th Cir. 1997) (concluding that "plaintiff failed to propose an objectively reasonable accommodation for his disability" because he could not perform any of his job functions from home).  The district court referred to both approaches in its decision.  See Mulloy, 2005 WL 1528208, at *6 n.2, 11 (referring to physical presence as both "necessary for [Mulloy] to be able to perform the essential functions of his position," on the one hand, and as "an essential function of Mr. Mulloy's position" and "a shorthand for [essential] functions," on the other).  We think it makes more sense on the facts of this case to treat Mulloy's remote location claim as a question of essential functions.

### a.    Essential Functions

Here, the parties do not dispute that Mulloy's essential functions as a senior electrical engineer at Acushnet's Ball Plant II included designing and programming; troubleshooting[4]; and training, supervising, and supporting personnel.  They disagree about whether physical presence was required to perform these functions and was thereby, itself, an essential function of the job.  Mulloy bears the burden of establishing that he can perform his job remotely.  See Kvorjak, 259 F.3d at 55.  Acushnet produced voluminous evidence in the summary judgment record to challenge

---

[4] As discussed below, Mulloy tries unpersuasively to create a dispute about troubleshooting as an essential function.

that proposition.  We turn now to an evaluation of the evidence on this essential function issue.

### i.    Employer's Judgment

Acushnet argues that, in the judgment of those most familiar with Mulloy's job functions, Mulloy's physical presence at Ball Plant II was an essential function of his job.  Kimberly Francis, who was Acushnet's Director of Engineering and Mulloy's supervisor, stated that "[t]o carry out the full responsibilities of the job, [Mulloy] was required to have interaction with the operator of the machine and the machine itself," which necessarily "required entrance into the Ball Plant."  Specifically, Francis stated that in order to troubleshoot, support electrical safety programs, lead investigations, and take corrective actions, Mulloy "had to enter the plant floor, plug his computer into the system to access the program and observe how the machine was reacting to the program commands. . . . This task could not be efficiently performed from a remote location since many of the adjustments are time sensitive."  According to Francis, "[Mulloy] needed to be able to visually watch the equipment to be able to trouble-shoot it."  While he could "see the controls operation" from a remote location, he could not "assess [] what the operator is doing, product quality, whether or not [the machine is] shooting balls in the air."

In order to design and program the machines, Francis stated that Mulloy "had to work with technicians and other engineers on the plant floor . . . [and] enter the area with the machine to make adjustments and finalize the program. To fully perform this function, the engineer must have access to the machines." Francis stated that Mulloy also needed to be able to physically access the machines in order to perform manual adjustments on them and to fully perform the "hands-on" training function of his job.

Francis stated that from May 2000 to November 2001, when Mulloy was restricted from accessing machines in the red zones, "Mulloy was reassigned to machines outside of the red zone in the Ball Plant so that he could fully perform all of the necessary functions of the job. During this time, approximately eighty percent (80%) of his work was on machines located outside of the red zone." Mulloy continued to perform a small amount of work -- presumably, approximately 20% -- on machines inside the red zones, but relied on others physically to access the machines for him. When Mulloy was restricted from Ball Plant II, however, Francis stated that he no longer had "regular[] access [to] the machines" and the machine operators and, thus, "was unable to perform the necessary responsibilities and functions of his job as a senior electrical engineer." Eric Bartsch, Acushnet's Vice President of Golf Ball Manufacturing, who had supervised Acushnet's electrical

-17-

engineers during his eighteen years at Acushnet, also stated that "Mr. Mulloy could not perform the necessary responsibilities and functions of the electrical engineering job from a remote location."  According to Francis, Mulloy's job in Fairhaven consisted of "finishing up" the documentation of previous projects on which he worked in Ball Plant II.  Francis stated that "[Mulloy] was no longer assigned work that required access to the machines," and instead, [these] assignments were given to other engineers or technicians in the Ball Plant or to outside vendors."  Bartsch similarly stated that after Mulloy was transferred to Fairhaven, "his tasks were reprioritized and he was instructed to work on documentation and a few small tasks that did not require him to enter the Ball Plant."

Not surprisingly, Mulloy rejects the views of his employer.  Instead, he asserts that his physical presence in Ball Plant II was not required, and that he performed -- and could have continued to perform -- his essential job functions remotely from the Fairhaven facility.  Mulloy presents five arguments challenging the judgment of his employer.

### (1)  Mulloy's Familiarity With the Machines and Their Operators

Mulloy first offers his own testimony that he did not have to see the machines or those operating them in order to perform his job functions, given his "long experience and familiarity with the programming, the machines, the electrical

-18-

circuits, and the machine operators," and his ability to communicate with mechanical engineers and technicians on the manufacturing floor "using telephone communications and remote computer technology." In light of the substantial weight we must accord Acushnet's view of Mulloy's job requirements, together with the wealth of authority recognizing physical attendance as an essential function of most jobs,[5] we agree with the district court that Mulloy's own self-serving testimony that he could perform the essential functions of his job from Fairhaven "is insufficient under Fed. R. Civ. P. 56(c) to create a 'genuine' issue of material fact concerning the essential functions of [his job]." Mason, 357 F.3d at 1121; see id. at 1122 ("We are reluctant to allow employees

---

[5] See, e.g., Mason, 357 F.3d at 1122 ("[T]he district court properly held Mason's physical attendance at the administration center was an essential function of the service coordinator position because the position required supervision and teamwork."); accord Hypes, 134 F.3d at 727; Vande Zande v. State of Wis. Dep't of Admin., 44 F.3d 538, 545 (7th Cir. 1995) ("[I]t would take a very extraordinary case for the employee to be able to create a triable issue of the employer's failure to allow the employee to work at home."); Carr v. Reno, 23 F.3d 525, 530 (D.C. Cir. 1994); Tyndall v. Nat'l Educ. Centrs., Inc. of Cal., 31 F.3d 209, 213 (4th Cir. 1994) ("Except in the unusual case where an employee can effectively perform all work-related duties at home, an employee who does not come to work cannot perform any of his job functions, essential or otherwise." (internal quotation marks and citation omitted)); see also Kvorjak, 259 F.3d at 57 (holding that employee's request for at-home accommodation was not reasonable); Smith, 129 F.3d at 867 (same). Although most of these cases involve requests to work from home as opposed to a satellite office, we agree with Acushnet that they are not distinguishable on that basis since both involve work from a location remote from the actual worksite.

to define the essential functions of their positions based solely on their personal viewpoint and experience.").

### (2) Mulloy's Ability to Work On-Site but Outside of Red Zones

Mulloy points to his performance of the essential functions of his job on-site but outside of the red zones as evidence of his ability to work off-site. We find this comparison unavailing. Acushnet does not dispute that Mulloy performed the essential functions of his job when he was on-site.[6] After being restricted from the red zones, Francis stated that 80% of Mulloy's work assignments were reallocated to machines located outside of the red zones. The other 20% of his work related to machines located within the red zones that did not require physical access. Francis stated that, with respect to those machines located in the red zones, Mulloy relied on another electrical engineer, Ken Souza, and one of Acushnet's electrical technicians, George Desrosiers, to access the restricted areas. Mulloy similarly testified that when he was restricted from the red zones, his focus shifted to problems in the non-restricted "half of the plant," while Desrosiers "switched places" with him. In this way, Mulloy was able to perform the essential functions of his job while on-site, even

---

[6] In her affidavit, Francis states that after Mulloy was removed from the red zones, "he was not capable of fully performing the training function of his job." Acushnet does not press this argument in its brief, and instead concedes that while Mulloy could perform his essential functions on-site, he could not do so after he was restricted from Ball Plant II.

though he was not able to access all of the manufacturing machines because some of them were located in the red zones.

When Mulloy was transferred off-site, however, he could no longer access any of the manufacturing machines, including those outside of the red zones.  As the district court stated, the fact that Mulloy may have been able to perform the essential functions of his job on-site despite "not [being] able to see some of the machines upon which he directed work to be done . . . does not support an inference that he could adequately perform his job without being able to see any of the machines or be easily accessible to those working on them."  Mulloy, 2005 WL 1528208, at *8.  In short, Mulloy's ability to perform his job functions on-site has nothing to do with his ability to perform his job remotely and, therefore, does not support his argument that he could perform the essential functions of his job from Fairhaven.

### (3) Francis' Positive Evaluation of Mulloy

Mulloy argues that Francis' positive evaluation of his work on February 19, 2002, more than two months after he was transferred to Fairhaven, demonstrates that he was able to perform the essential functions of his job remotely.  We disagree.  While the evaluation does not set forth the period of evaluation, it appears to be an annual evaluation based on the numerous work projects listed and its reference to "last year's review."  It is undisputed that after his transfer to the Fairhaven facility at the

-21-

end of November 2001, Mulloy continued performing some of the tasks that he had performed at Ball Plant II for approximately one and a half months, until January 10, 2002, when Mulloy was asked to spend 90% of his time typing manuals and his projects were assigned to other engineers. Therefore, regardless of when the annual evaluation began, Mulloy's off-site work on Ball Plant II assignments comprised only one and a half months of the work reviewed in that evaluation period. Francis' positive evaluation of Mulloy's performance for the entire year thus provides inadequate support for Mulloy's argument that he could work remotely from Fairhaven. In fact, Francis states unequivocally in both her deposition testimony and affidavit that Mulloy could not work remotely.

### (4) Francis' Post-Termination Statements

Mulloy also argues that the district court should not have credited Francis' statements because Riall did not consult Francis prior to terminating Mulloy, and thus did not rely on the information that she provided in his decision to terminate. We disagree. Francis' statements mirror the conclusions of Bartsch who <u>was</u> consulted prior to Mulloy's termination and, therefore, corroborate Acushnet's basis for terminating him. The district court, therefore, did not err in considering this evidence. The district court likewise did not err in considering the statements of Bartsch, who "ha[d] worked at Acushnet for eighteen (18) years,"

"was knowledgeable of the necessary responsibilities and functions of the senior electrical engineering job at Ball Plant II," and who "determined that Mr. Mulloy was unable to perform the necessary responsibilities and functions of the senior electrical engineer job from a remote location."

### (5) Francis' Statements About Troubleshooting

Mulloy also argues that the district court erred in crediting Francis' statement that Mulloy needed to see the machines in order to troubleshoot them. Mulloy notes that the job description refers only to "training and supporting maintenance personnel to troubleshoot." According to Mulloy, it is the maintenance personnel -- not Mulloy -- who need to be able to see the machines. Even if we ascribe this meaning to the words cited by Mulloy, Mulloy's argument is not significantly probative and, in all events, it is directly contradicted by other items in the record. In a second, more detailed job description not referenced by Mulloy, the duties of an electrical engineer include "troubleshoot[ing] process-related issues using proven problem solving techniques" as well as "[t]rain[ing] and support[ing] maintenance personnel to troubleshoot." And in his Statement of Material Facts, Mulloy expressly agreed with Acushnet's list of job responsibilities, which included "training and supporting maintenance personnel, [and] troubleshooting electrical and electronic controls," as well as with Acushnet's statement that

-23-

Mulloy "was responsible for troubleshooting and developing new equipment." The district court did not err in considering Francis' statements about troubleshooting.

### ii. Job Description

Acushnet points to the job description for an electrical engineer at Acushnet in support of its argument that physical presence was an essential function. Among the essential functions listed in the job description are teamwork, troubleshooting, evaluating, and training and supporting -- all of which imply some level of interaction with the machines and personnel at Ball Plant II. "We are not persuaded the absence of [physical attendance] from the job description demonstrates th[at] function [was] non-essential. As commonsense suggests, [the employer] probably did not even consider informing its employees that they were actually required to show up at the workplace . . . when it drafted the [] job description -- that is a given." Mason, 357 F.3d at 1122; see also Kvorjak, 259 F.3d at 57 n.17 (holding that "claims adjudicator's duties as advisor to other call center staff," which include troubleshooting, teamwork, and training staff members, "demonstrate[] that the position cannot be performed at home"); id. at 57 ("Courts that have rejected working at home as a reasonable accommodation focus on evidence that personal contact, interaction, and coordination are needed for a specific position." (quoting EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship

Under the Americans with Disabilities Act, 1999 WL 33305876, at *34 n. 93 (March 1, 1999)) (internal quotation marks omitted)); <u>Vande Zande</u>, 44 F.3d at 544 ("Most jobs in organizations public or private involve team work under supervision rather than solitary unsupervised work, and team work under supervision generally cannot be performed at home without a substantial reduction in the quality of the employee's performance."). We therefore agree with Acushnet that the job description for an electrical engineer supports Acushnet's argument that Mulloy's physical presence was an essential function of his job.

Mulloy argues that since "the job description specifies that the troubleshooting oversight function represents only 10% of Mulloy's overall responsibilities," troubleshooting is a "marginal" -- not an "essential" -- function. This argument also lacks merit. Mulloy explicitly states that the parties "stipulated that the 'essential functions' of Mulloy's former position as a senior electrical engineer in Acushnet's Ball Plant II are accurately represented in a company-drafted job description for Mulloy's position." This job description lists "trouble-shooting" as one of those functions. Mulloy cannot now claim that troubleshooting is only a marginal function. Even if Mulloy had not stipulated to the essential nature of this function, a job function requiring 10% of Mulloy's time is not insignificant when considered in relation to

the five remaining essential functions of his job, each of which requires only 10% to 25% of his time.

### iii. Work Experience of Past Incumbents and Current Incumbents

Mulloy offers no evidence that any electrical engineer at Acushnet has ever performed the job remotely. As the district court stated, "Mulloy has no testimony from other former and current employees -- and in particular, from the other senior electrical engineer at Acushnet -- to substantiate his view of the essential duties of his position." Mulloy, 2005 WL 1528208, at *8; see id. ("Appellant could have, but did not, depose current claims adjudicators about their duties." (quoting Kvorjak, 259 F.3d at 58) (internal quotation marks omitted)). The absence of such evidence, together with Francis' testimony that she was not aware of any electrical engineer working out of Fairhaven, supports Acushnet's argument that physical presence was an essential function of Mulloy's job.

The experience of those who have taken over Mulloy's job functions since his termination also supports the conclusion that the job cannot be performed remotely. It is undisputed that over 70% of Mulloy's former job functions are performed in Ball Plant II by either employees or outside vendors. Based on the work experience of past and current employees, Mulloy has failed to present an adequate basis to challenge the company's contention that his physical presence was an essential function of his job.

-26-

### b.    Reasonable Accommodation

Having determined that Mulloy's physical presence was an essential function of his job, we next ask whether his proposed accommodation -- working remotely from Fairhaven -- was reasonable. It is well established that, while a reasonable accommodation may include job restructuring, 42 U.S.C. § 12111(9)(B), "[t]he law does not require an employer to accommodate a disability by foregoing an essential function of the position or by reallocating essential functions to make other workers' jobs more onerous." Kvorjak, 259 F.3d at 57 (internal citation and quotation marks omitted); see also Mason, 357 F.3d at 1124 ("[A] request to work at home is unreasonable if it eliminates an essential function of the job."); Phelps, 251 F.3d at 26 ("Although a reasonable accommodation may include job restructuring, an employer need not exempt an employee from performing essential functions, nor need it reallocate essential functions to other employees." (internal citation and quotation marks omitted)).  Here, Mulloy requests an accommodation which would prevent him from performing an essential function of his job, namely, being physically present at Ball Plant II.

As the district court stated, Mulloy's request to work from Fairhaven "in essence requires not an accommodation but a redefinition of his job." Mulloy, 2005 WL 1528208, at *10.  But "[a]n employer is not required by the ADA to create a new job for an employee." Phelps, 251 F.3d at 27.  Mulloy's proposed

-27-

accommodation is therefore per se unreasonable.  See Mason, 357 F.3d at 1124 ("[Employee's] request for an at-home accommodation is unreasonable on its face because it seeks to eliminate an essential function of [employment] position.").[7]  The district court did not err in concluding that Mulloy's proposed accommodation was unreasonable, and that he thus was not a "qualified individual with a disability" under the ADA.[8]

**D.       Application of Massachusetts' Countpart to the ADA, Chapter 151B, § 4**

**1.       Consistency Between ADA and Chapter 151B, § 4**

Our analysis so far has focused on whether Mulloy was a "qualified individual with a disability" under the ADA.  We must now address whether Mulloy was a "qualified handicapped person" under Massachusetts' state-law counterpart to the ADA, Chapter 151B, § 4.  We have previously noted that this statute "tracks the ADA in virtually all respects."  Gillen, 283 F.3d at 20 n.5; see

---

[7] Since Mulloy did not propose a reasonable accommodation, we need not address whether the accommodation he did propose imposed an undue hardship on Acushnet.  See Cisneros v. Wilson, 226 F.3d 1113, 1129 (10th Cir. 2000) ("[Since] Plaintiff never established that her request for leave was 'reasonable' . . . the court need not address whether her request would constitute undue hardship."), overruled on other grounds by Bd. of Tr. of Univ. of Ala. v. Garrett, 531 U.S. 356, 374 n. 9 (2001); Vande Zande, 44 F.3d at 543 ("The employee must show that the accommodation is reasonable . . . . Even if this prima facie showing is made, the employer has an opportunity to prove that upon more careful consideration the costs are excessive.").

[8] Because we decide this case on the second element of the ADA, we need not address the third element -- whether Acushnet discharged Mulloy because of his disability.

also Labonte v. Hutchins & Wheeler, 678 N.E.2d 853, 856 n.5 (Mass. 1997) ("[O]ur statutes in the area of employee discrimination law closely mirror the [ADA]."). The action proscribed by Chapter 151B, § 4 is nearly identical to the action proscribed by the ADA. Under Chapter 151B, an employer shall not "discriminate against, because of his handicap, any person alleging to be a qualified handicapped person," that is, "a handicapped person who is capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of a particular job with reasonable accommodation to his handicap." Id. §§ 1(16), 4. In order to establish a claim of unlawful employment discrimination under Chapter 151B, a plaintiff must demonstrate the same three requirements as under the ADA: (1) she suffers from a "handicap," i.e., "a physical or mental impairment which substantially limits one or more major life activities," id. § 1(17); (2) "[s]he is a 'qualified handicapped person'; and (3) [s]he was fired solely because of h[er] handicap," Labonte, 678 N.E.2d at 859.

In light of these similarities, "[t]he Supreme Judicial Court of Massachusetts has indicated that federal case law construing the ADA should be followed in interpreting the Massachusetts disability law." Ward, 209 F.3d at 33 n.2 (citing Wheatley v. Am. Tel. & Tel. Co., 636 N.E.2d 265, 268 (Mass. 1994) ("It is our practice to apply Federal case law construing the

Federal anti-discrimination statutes in interpreting [Chapter 151B].")). Accordingly, while "we write in terms of the ADA, our comments apply with equal force to [Mulloy's] claim under [Chapter 151B]." Gillen, 283 F.3d at 20 n.5; see also Whitney v. Greenberg, Rosenblatt, Kull & Bitsoli, P.C., 258 F.3d 30, 32 n.1 (1st Cir. 2001) ("Given the similarity [between ADA and Massachusetts disability law], our singular analysis disposes of both the federal and state claims.").

### 2. Impact of Massachusetts' Workers' Compensation Law on Chapter 151, § 4

Notwithstanding the many similarities between Chapter 151B, § 4 and the ADA, there is a gloss which Massachusetts' workers' compensation law, Mass. Gen. Laws ch. 152, § 75B(1), arguably places on the determination of a "qualified handicapped individual" under Chapter 151B, § 4 for a work-related injury. Chapter 152, § 75B(1) states that

> [a]ny employee who has sustained a work-related injury and is capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of such job with reasonable accommodations, shall be deemed to be a qualified handicapped person under the provisions of chapter one hundred and fifty-one B.

Mulloy argues that even if he is not disabled under the ADA, he is nevertheless a per se "qualified handicapped person" under Chapter 151B by virtue of the interaction between Massachusetts' anti-discrimination law and Massachusetts' workers' compensation law. In other words, Mulloy contends that Chapter

-30-

152, § 75B(1) entitles him to special treatment under Chapter 151B, § 4 -- treatment not recognized under the ADA.

The meaning of Chapter 152, § 75B(1) is unclear. The United States District Court for the District of Massachusetts has described the statute as a "major exception to the traditional definition of a 'handicapped person,'" which expands the protection afforded by Chapter 151B to plaintiffs regardless of whether they can demonstrate substantial limitation of a major life activity. See Gilman v. C & S Wholesale Grocers, Inc., 170 F. Supp. 2d 77, 85 (D. Mass. 2001) (holding that a plaintiff who suffered a work-related injury and was capable of performing the essential functions of his job under Chapter 152, § 75B(1) "cannot be excluded as a matter of law, . . . from being a 'qualified handicapped person' under chapter 151B" -- notwithstanding his inability to demonstrate substantial limitation of a major life activity).

While the Supreme Judicial Court has declined to consider this issue, see Dartt v. Browning-Ferris Indus., Inc., 691 N.E.2d 526, 536 & n.30 (Mass. 1998) (refusing to consider "the applicability, if any, of [Chapter 152, § 75B(1)] to [plaintiff's] claim," given the "slight" evidence that plaintiff was regarded as having a substantially limiting impairment under Chapter 151B), the majority of Massachusetts' lower courts similarly view Chapter 152, § 75B(1) as an alternative means for plaintiffs to demonstrate that

they are "qualified handicapped persons." Compare Everett Indus., Inc. v. Mass. Comm'n Against Discrimination, No. 98-P-960, 2000 WL 1476321, at *5 & n.13 (Mass. App. Ct. June 29, 2000) (unpublished), and Zarrella v. City of Everett, No. 955305B, 1996 WL 1186938, at *2 & n.2 (Mass. Super. Ct. May 1, 1996), with Freire v. First Nat'l, No. 964620, 1998 WL 1181751, at *8 (Mass. Super. Ct. July 22, 1998).

We need not resolve this uncertainty here. While it remains unclear whether, by virtue of Chapter 152, § 75B(1), a plaintiff can forego showing substantial limitation of a major life activity and still be deemed a "qualified handicapped person" under Chapter 151B, § 4, one thing is clear: both Chapter 151B, § 4 and Chapter 152, § 75B(1) require that a plaintiff be "capable of performing the essential functions of a particular job, or [] be capable of performing the essential functions of a particular job with reasonable accommodation." Mulloy argues that since "the onset of [his] occupational asthma was work-related," he should be deemed a "qualified handicapped person" under Chapter 151B, § 4 by virtue of Chapter 152, § 75B(1). We disagree. Since Mulloy cannot show that he was capable of performing the essential functions of his job with or without reasonable accommodation, he is not a "qualified handicapped person" under Chapter 151B, § 4. See Poh v. Mass. Corr. Officers Federated Union, No. 03-11987-RWZ, 2006 WL 1877089, at *4 (D. Mass. July 7, 2006) (holding that even if

-32-

Chapter 152, § 75B(1) constitutes an exception to the traditional definition of a "qualified handicapped person" under Chapter 151B, plaintiff still "does not fall within [Chapter 152, § 75B(1)'s] confines" because "plaintiff has presented no evidence that he was capable of performing the essential functions of his job."). The district court correctly rejected this state law claim.

## IV.

We conclude that Mulloy was not a qualified individual with a disability under the ADA or a qualified handicapped person under Section 151B, §4 because he could not perform the essential functions of his job with or without reasonable accommodation. The district court's order granting summary judgment to Acushnet is **affirmed**.

**So ordered**.