LIPEZ, Circuit Judge. Plaintiff-appellant Mark Reenstierna, a real estate appraiser, was the subject of a disciplinary hearing before the New Hampshire Real Estate Appraisal Board (“the Board”). In that hearing, the Board considered as evidence a report on Reenst-ierna’s work written at the Board’s request by- defendant-appellee Kenneth Currier. After convincing the Board to reconsider an earlier unfavorable decision and dismiss the grievance charges, Reenstierna sued Currier, accusing him of defamation and other torts. The district court granted summary judgment in favor of Currier, concluding that New Hampshire’s absolute witness immunity rule extends beyond testimony provided at an administrative hearing to include statements in the report that Currier prepared for the Board. We affirm. I. Reenstierna, the president of Reenstier-na LLC, works as a real estate appraiser and consultant in New York and New England, specializing in the appraisal of gas stations and convenience stores. Currier, also a real estate appraiser with expertise in gas stations and convenience stores, is licensed in Maine, Massachusetts, New Hampshire, and New York. The two men are the top “go-to” people in the region for parties seeking such appraisals. Cumberland Farms, a gas station and convenience store chain, hired Reenstierna in early 2010 to appraise one of its properties in the city of Rochester that was the subject of a taking by the New Hampshire Department-of Transportation. Reenstier-na provided his appraisal to Cumberland Farms in March. On the signature line of the appraisal next to his then-expired New Hampshire > Certified General Real Estate Appraiser licensing number, Reenstierna included a parenthetical notation that said, “Renewing.”[1] Specifically citing Reenstierna’s appraisal of the Cumberland Farms site, an employee of the New Hampshire Department 'of- Transportation filed an anonymous grievance- against Reenstierna with the Board in September 2011, complaining that he was working as a real estate appraiser without the necessary' licensure. The Board subsequently voted to investigate the complaint and appointed a complaint officer, Mark Correnti, who asked Currier to provide a report on Reenstier-na’s Cumberland Farms appraisal. At the time Correnti hired him; Currier was a competitor of Reenstierna!s throughout New England, including in New Hampshire; Currier had previously performed-"approximately twenty appraisals for Cumberland Farms over the preceding decade and remained on Cumberland Farms’ list of approved appraisers from whom the company would accept bids.[2] In addition to faulting Reenstierna for performing the appraisal without a license, Currier’s, report criticized ■ the. quality of the appraisal itself, citing six flaws. After receiving Currier’s report, Correnti attempted to resolve the grievance against Reenstierna informally in accordance with Board rules. When Reenstierna rejected Correnti’s proposal that he surrender his license, Correnti recommended to the Board that it proceed with a disciplinary hearing. The Board accepted the recommendation, and a hearing was held in July of 2012. Initially, the Board ruled that Reenstier-na had violated the Uniform Standards of Professional Appraisal Practice’s “Ethics Rule,” which bars an individual from indicating that he is a licensed appraiser when he is not.[3] The Board officially “reprimanded” Reenstierna in a “Final Decision and Order.” It further ordered him to (1) pay an “administrative o fine in the amount of $1,000”; (2) “complete a 15-hour [industry standards] course”; (3) “furnish a copy of the Final Decision and Order to any current employer for whom [he was] performing] services” within ten days; and (4) “furnish [for the following year] a copy of [the],Final Decision and Order to any employer to which [he] may apply for work as an appraiser or for work in any capacity which requires appraisal knowledge.” The Board also “ordered that [the] Final Decision and Order shall become a permanent part of .... Reenstierna’s file, which is maintained by the Board as a public document.” The disciplinary sanctions were stayed in December 2012, however, after Reensti-erna filed a motion asking the Board to reconsider its findings. In April 2013, the Board notified Reenstierna that it was dismissing the original complaint against him, stating that the evidence and testimony-presented were not sufficient to establish the presence of professional misconduct. In February -2014, Reenstierna filed a diversity suit against Currier in the United States District Court-for the District of New Hampshire, alleging that Currier had (1) violated New Hampshire’s. Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A; (2) defamed Reenstierna; and (3) tortiously interfered with Reenstierna’s advantageous business relations. Specifically, he alleged that Currier knowingly and purposely submitted a false report to the Board and that each of the purported deficiencies cited against Reenstierna in Currier’s report constituted material misrepresentations of fact. He further contended that Currier falsely certified in his report to the Board that he had “no personal interest with respect to the parties involved” or any “bias with respect ... to the parties involved with the assignment.” The district court granted Currier’s motion for summary judgment, concluding that New Hampshire’s absolute witness immunity doctrine precluded the .use of Currier’s report to establish liability on Reenstierna’s claims.[4] Reenstierna timely appealed. We review a district court’s grant of summary judgment de novo, construing the evidence and all reasonable inferences in the light most favorable to the non-moving party—here, Reenstierna. Audette v. Town of Plymouth, 858 F.3d 13, 20 (1st Cir. 2017). “Summary judgment is appropriate where ‘the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that .there is no genuine issue as to any material fact and that the moving party, is entitled to judgment as .a matter of law.’ ” Id. at 19 (quoting Mulloy v. Acushnet Co., 460 F.3d 141, 145 (1st Cir. 2006)). II. To resolve this case, we must decide if the district court correctly applied New Hampshire’s absolute witness immunity doctrine. If it applies to the statements in Currier’s report, we must affirm. If it does not apply, we must vacate the judgment so that Reenstierna can use the statements in the report in a trial of his claims against Currier. A. New Hampshire’s Law of Absolute Witness Immunity “The ability of courts, under carefully developed procedures, to separate truth from falsity, and the importance of accurately resolving factual disputes in criminal (and civil) cases are such that those involved in judicial proceedings should be ‘given every encouragement to make a full disclosure of all pertinent information within their knowledge.’ ... For a witness, this means he must be permitted to testify without fear of being sued if his testimony is disbelieved.” Imbler v. Pachtman, 424 U.S. 409, 439, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (White, J., concurring) (quoting 1 F. Harper & F. James, The Law of Torts § 5.22, p. 424 (1956)). In order to effectuate such full disclosure, the common law has traditionally acknowledged the importance of “providing] absolute immunity from subsequent damages liability for all persons—governmental or otherwise—who were integral parts of the judicial process.” Briscoe v. LaHue, 460 U.S. 325, 335, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983). Consistent with these concerns, New Hampshire has long recognized that “statements made in the course of judicial proceedings are absolutely privileged from liability in civil actions.” Pickering v. Frink, 123 N.H. 326, 461 A.2d 117, 119 (1983) (citing McGranahan v. Dahar, 119 N.H. 758, 408 A.2d 121, 124 (1979)). This absolute privilege “is tantamount to an immunity. It is not conditioned on the actor’s good faith.” McGranahan, 408 A.2d at 124. Invoking Briscoe, the New Hampshire Supreme Court most recently addressed the extent of witness immunity, and whether it should reach beyond the walls of a courtroom, in Provencher v. Buzzell-Plourde Assocs., 142 N.H. 848, 711 A.2d 251, 255 (1998). Plaintiff Arthur Provencher had initially agreed to sell his property to the state for a highway project. Id. at 253. If the parties could not negotiate a satisfactory price, however, the state was entitled to take Provencher’s property by eminent domain. Id. New Hampshire thus hired two real estate appraisal firms, both of which valued Provencher’s land at $1 million. Provencher claimed that his land was in fact worth $7 million and refused to sell his property. Id. The state’s appraisers testified at a subsequent condemnation hearing, where a jury ultimately valued Provencher’s property at $4 million. Provencher sued the government’s appraisers, alleging that they had breached various duties owed to him as an intended third-party beneficiary of their contract with the state. Id. The defendants argued that their appraisal, any statements made in preparation for the hearing, and their testimony at the hearing were protected by absolute witness immunity. Id. Pro-vencher contended that even if the appraisers’ testimony at the disciplinary hearing was protected by witness immunity, their pre-hearing statements and reports were beyond the doctrine’s safe harbor. Id. In deciding to extend witness immunity beyond testimony at the judicial proceeding, the New Hampshire Supreme Court heeded the counsel of the Supreme Court of Washington, “recognizing] that ‘an expert’s courtroom testimony is the last act in a long, complex process of evaluation and consultation with the litigant.’ ” Id. at 255 (quoting Bruce v. Byrne-Stevens & Assocs. Eng’rs, 113 Wash.2d 123, 776 P.2d 666, 672 (1989)). Noting that “it is difficult to distinguish an expert witness’s testimony from the acts and communications upon which it is based,” id., the court again quoted Bruce: The privilege or immunity is not limited to what a person may say under oath while on the witness stand. It extends to statements or communications in connection with a judicial proceeding.... If this were not so, every expert who acts as a consultant for a client with reference to proposed or actual litigation, and thereafter appears as an expert witness, would be liable to suit at the hands of his client’s adversary on the theory that while the expert’s testimony was privileged, his preliminary conferences with and reports to his client were not, and could form the basis of a suit for tortious interference. Id. (quoting Bruce, 776 P.2d at 672-73). The court next looked to the Restatement, which provides that “[a] witness is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding or as part of a judicial proceeding in which he is testifying, if it has some relation to the proceeding.” Id. at 255-56 (quoting Restatement (Second) of Torts, § 588 (1977)). Importantly, the court cited comment e of section 588, which cabins the extent of the privilege by cautioning that a witness’s pre-hearing statement should only be afforded immunity if the statement “has some relation to a proceeding that is actually contemplated ■ in good faith and under serious consideration by the witness or a possible party to the proceeding.” Id. at 256 (quoting Restatement (Second) of Torts § 588 cmt. e (1977)) (emphasis added in Provencher). Comment e further cautions that “[t]he bare possibility that the proceeding might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered.” Id. (quoting Restatement (Second) of Torts § 588 cmt. e). Guided by these authorities, the New Hampshire Supreme Court held that it would join those courts which have concluded that pertinent pre-litigation communications between a witness and a litigant or attorney are absolutely privileged from civil liability if litigation was contemplated in good faith and under serious consideration by the witness, counsel, or possible party to the proceeding at the time of the communication. Id. at 256. B. Application The parties do not dispute that the disciplinary hearing at issue in this case constitutes a “judicial proceeding” for the purpose of witness immunity analysis.[5] Currier argues that he is entitled to claim witness immunity because the role he played in the Board’s disciplinary process is comparable to the role played by the appraisers hired by the state in Provencher. On its face, there is considerable force to Currier’s argument. The appraisers in both cases participated in an administrative process provided by statute. In Pro-vencher, the appraisers were asked to investigate the value of property designated for taking by the state in eminent domain proceedings. Id. at 253. Ideally, the appraisals commissioned by the state would provide a basis for an agreement between the landowner and the state on the property’s value. Id. If that did not happen, however, the value would have to be determined in an administrative proceeding, informed, in part, by the appraisals commissioned by the state. Id. In this case, as part of a disciplinary process initiated by the Board, Currier was commissioned to investigate and prepare a report on Reenstierna’s possible violations of Board rules and industry standards in his Cumberland Farms appraisal. Ideally, that report would provide a basis for a resolution of the disciplinary process through an agreement. If that effort failed, however, the Board would conduct a disciplinary hearing, informed, in part, by Currier’s report. Reenstierna rejects this comparison on two grounds. First, he asserts that the district court erred by considering Provencher at all. Instead, he insists that the relevant precedent is the New Hampshire Supreme Court’s more recent decision in Frost v. Delaney, 168 N.H. 353, 128 A.3d 663 (2015), which he says supports the proposition that the appropriate immunity analysis for- Currier’s statements is official immunity, rather than absolute witness 'immunity. “Official immunity” under New Hampshire law is a narrower form of immunity that protects the acts and omissions of government officials. See id. at 672 (“Under -official immunity, government' officials are protected from personal liability for those decisions, acts or omissions that are: (1) made within the scope of their official duties while in the course of their employment; (2) 'discretionary rather than ministerial; and (3) not made in a wanton or reckless manner.”). ■ New Hampshire’s official immunity standard is sometimes compared to the qualified immunity standard applied to federal civil-rights cases filed pursuant to 42 U.S.C. § 1983. Id. Second, Reenstierna argues that the' statements in Currier’s report are not protected by witness immunity because litigation was not contemplated at the time he performed the investigation and prepared his report for the Board. 1. Official Immunity In Frost v. Delaney, Frost was charged with four violations of New Hampshire’s mortgage licensing laws on the basis of an investigation carried out by a New Hampshire Banking Department investigator. Id. at 666-67. After the court dismissed both criminal and administrative charges against Frost, he sued the investigator under § 1983, the New Hampshire Constitution, and New Hampshire tort law. Id. at 667. The trial court dismissed the federal claims on the basis of qualified immunity, and the state constitutional and tort claims on the basis of New Hampshire’s official immunity doctrine.[6] Id. at 668. Frost then appealed- the dismissal- of the §--1983 claims, but not the state law claims. Id. The New Hampshire Supreme Court affirmed the trial court’s qualified immunity determination. Id. at 668-73. This description of the Frost case indicates why Reenstierna’s reliance on it is misplaced. Reenstierna filed New Hampshire common law tort claims against Currier. Frost filed a federal civil rights claim under § 1983, alleging that a government investigator violated his Fourth and Fourteenth Amendment rights under the U.S. Constitution when she misrepresented material facts on an-application for a search warrant of his residence. Id. at 667-68. On appeal, the New Hampshire Supreme Court analyzed only the federal law doctrine of qualified immunity under § 1983. Id. at .668-72. It said nothing about the application of New Hampshire’s doctrine of official immunity to the out-of-court statements of a government investigator. Nor did it say anything about New Hampshire’s absolute witness immunity doctrine. Ignoring critical differences between the Provencher' and Frost cases, Reenstierna asks us to conclude that the New Hampshire Supreme Court used Frost, a- case applying qualified immunity, to the pre-hearing statements of an investigator facing federal civil rights claims, to circumscribe by implication its earefullyreasoned decision in Provencher that absolute witness immunity applies to the pre-hearing statements of an investigator facing state tort claims. Putting aside this implausible view of judicial decisionmaking, a federal court sitting in diversity has no license to reformulate state law in the manner requested by Reenstierna.[7] To be sure, Reenstierna s allegation— that Currier unethically accepted the Board’s invitation to act as an investigator with the intent of defaming and administratively prosecuting his prime competitor—is a serious charge. It is perhaps understandable that Reenstierna believes that his case against Currier is more akin to the alleged civil rights violations committed by the Banking Department investigator in Frost, whose false statements led to both criminal and civil administrative charges against Frost, than it is to the negligence and fraud claims in Provencher, where the statements at issue were about the value of a parcel of land. The allegedly defamatory statements in this case could arguably inflict irreparable damage to Reenstierna’s professional reputation, an injury much more severe than the mere disagreement over property value in Provencher. Nevertheless, Provencher’s explicit adoption of the Restatement, which provides that “[a] witness is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding,” clearly" indicates that the New Hampshire Supreme Court, mindful of the importance of absolute witness immunity to accurate fact-finding in civil and criminal cases, contemplated the application of that immunity to a’common law tort action such as Reeri'stierna’s. 711 A,2d at 255-56 (quoting Restatement (Second) of Torts, §. 588 (1977)) (emphasis added). Still, with Frost, Reenstierna does highlight the different treatment under New Hampshire law of the pre-hearing statements of government investigators. Investigators facing state tort claims enjoy absolute witness immunity for their pre-hearing statements. As interpreted by the Supreme Court of New Hampshire, investigators facing federal civil rights claims for their pre-hearing statements have the benefit of only qualified immunity. In the judgment of the New Hampshire Supreme Court, there may be good reasons .for this distinction, or it may be problematic. Either way, this is an issue for the New Hampshire Supreme Court to address in a future case, not us. Our dissenting colleague argues that, rather than applying the law as set out in Provencher, we should give the New Hampshire Supreme Court- the opportunity to reach a different result by certifying to that court the question of Provencher’s applicability to the circumstances of this case. Certification to,the New Hampshire Supreme Court is appropriate when a question of state law is “determinative of the case” and “there is no controlling precedent” from; that court. Old Republic Ins. Co. v. Stratford Ins. Co., 777 F.3d 74, 86 (1st Cir. 2015) (citing N.H. Sup. Ct. R. 34); see also, e.g., Trull v. Volkswagen of Am., Inc., 187 F.3d 88, 100 (1st Cir. 1999) (explaining decision to certify where “[t]he New Hampshire Supreme Court has not yet faced the issue”). On .the question now before us, however, the New Hampshire Supreme Court has spoken. The Provencher court expressly recognized the divergent views on whether absolute immunity “extends to communications that occur prior to the initiation of judicial proceedings,” and then chose to “join those courts which have concluded that pertinent pre-litigation communications between a witness and a litigant or attorney are absolutely privileged from civil liability if litigation was contemplated in- good faith and under serious consideration- ... at the time of the communication.” Provencher, 711 A.2d at 255, 256. Assuming the good faith and “under serious consideration” prerequisites are met— which we discuss below—the- holding of Provencher squarely applies to the statements at issue here. Of course, the New Hampshire Supreme Court is free to reverse itself or distinguish Provencher away. However, it is not our prerogative, through the process of certification, to suggest that the New Hampshire court do so. Having chosen the federal forum for his state-law claims, the plaintiff must live with our obligation to apply New Hampshire law as it currently stands.[8] 2. Litigation under Serious Consideration [9] Reenstierna argues that even' if the Provencher framework applies to pre-hearing statements at issue in common law tort actions filed against state investigators such as Currier, its holding is inapplicable to this particular case because litigation was not “under serious consideration” at the time Currier conducted his investigation and wrote his report. Provencher, 711 A.2d at 256. Reenstierna directs us to the timeline of Currier’s investigation and the Board’s de-cisionmaking process, noting that Correnti hired Currier, and Currier completed his report, before the Board decided to initiate Reenstierna’s disciplinary hearing. He also cites testimony from the Board President that the Board actually decided to commence the administrative 'hearing ■ based primarily upon Currier’s report. Because Currier’s report induced the Board to-take action, Reenstierna contends, litigation could not have been “under serious consideration” at the time it was prepared, and, hence, the report is beyond the scope of Provencher’s immunity doctrine. Reenstierna reads Provencher too 'narrowly. The state statute that framed''the progression of the eminent domain proceedings in Provencher, the Eminent Domain Procedure Act (“EDPA”), N.H. Rev. Stat. Ann. § 498-A, is analogous to the New Hampshire regulations that structured the Board’s disciplinary process involving Reenstierna. In Provencher, the New Hampshire Supreme Court noted that EDPA requires the state to hire an appraiser before it makes an offer to purchase property, and that the appraisal “often serves as the basis” of the state’s initial offer. 711 A.2d at 256. The government may initiate a condemnation proceeding only after a property owner rejects th,e state’s purchase offer. Id. When an individual files a grievance against an appraiser such as Reenstierna, state regulations require the Board to appoint a complaint officer (here, Correnti) if the allegation in the grievance constitutes a violation of state law or the Uniform Standards of Professional Appraisal Practice. N.H. Code Admin. R. Ann. Rab 203.02(b)(2) (2017).[10] When an appraisal is included as part of the complaint, as it was here, the regulations further require the complaint officer or an investigator to evaluate the appraisal for conformity with professional standards. Id. at 203.02(b)(4). Because he was not an expert in convenience store appraisals, Correnti hired Currier to perform this task. The regulations instruct the complaint officer to issue a final report, including any investigatory reports, and require the Board to either (1) dismiss the complaint; (2) accept an informal .resolution if the complaint officer was able to negotiate such a resolution with the accused appraiser; (3) commence an adjudicative hearing if the evidence suggests misconduct and an informal resolution was not established; or (4) investigate the matter further. Id. at 203.02(b)(7). When Cor-renti hired Currier to review Reenstierna’s appraisal, a judicial proceeding “was contemplated in good faith and under serious consideration” by the Board within the meaning of Provencher. 711 A.2d at 256. As the Provencher Court said, “[sjubjeet-ing a party’s witnesses to liability for their pre-litigation statements in cases of this nature would undoubtedly have a perverse effect on the initiation and presentation of cases.” Id. at 257 (emphasis added). Our dissenting colleague suggests that the facts here are distinguishable from Provencher with respect to the “under serious consideration” criterion because the State and property owner there had signed a pre-appraisal agreement acknowledging that eminent domain proceedings would occur if the parties could not agree on a purchase price. That agreement, however, was merely a particularized version of the governing statutory scheme requiring appraisals and negotiation before the state may begin the condemnation process. See N.H. Rev. Stat. § 498-A:4. ■ As described above, here, too, the governing framework explicitly includes a proceeding as one possible outcome after an investigatory review of a complaint involving an appraisal. The absence of an agreement between the parties incorporating the regulatory scheme does not make a judicial proceeding merely a “bare possibility”—the status the Restatement contrasts - with “under serious consideration”—even if such an agreement could have added to the parties’ awareness that a proceeding might occur. Provencher, 711 A.2d at 256 (quoting Restatement (Second) of Torts § 588 cmt. e). To the contrary, once, an appraisal review is triggered by a complaint,, the prospect .of a proceeding inevitably looms large for the parties. Hence, on the spectrum between seriously considered and a mere possibility, the likelihood of litigation in this case is well within Provencher’s scope. III. After carefully considering Reenstier-na’s contrary arguments, we agree with the district court that Currier’s statements in his report are shielded in this action by New Hampshire’s absolute witness immunity doctrine as set forth in Provencher. When it decided Provencher, the New Hampshire Supreme Court explicitly noted that it was adopting an absolute witness immunity rule that applied to allegedly defamatory pre-hearing statements. Id. at 256. In this diversity action, we are bound to implement that choice. Affirmed. . Although Reenstierna may have been indicating to Cumberland Farms that he had personally begun the process of renewing his then-expired license, there is no formal designation of "Renewing” in New Hampshire. An appraiser either possesses a valid license or does not. . Since preparing the report on Reenstierna’s work for the Board, Currier has appraised at least one property for Cumberland Farms, in 2015. .The Board also determined that the qualitative flaws that Currier flagged in Reenstier- - na’s appraisal were "minor” and that the complaint officer charged with "prose-cutting]” the grievance against Reenstierna “failed to meet [his] burden of proof on these issues beyond a reasonable doubt.” . The district court actually expressed its ruling somewhat differently, stating that,"the court finds that Currier is absolutely immune from a suit based on his acceptance of the assignment to review Reenstierna’s appraisal and his analysis of that appraisal.” In reality, however, New Hampshire's absolute witness immunity doctrine does not provide blanket immunity from suit. Instead, the New Hampshire Supreme Court has held that the doctrine precludes the use of certain statements in support of a theory of liability. See, e.g., Provencher v. Buzzell-Plourde Assocs., 142 N.H. 848, 711 A.2d 251, 256 (1998); Pickering v. Frink, 123 N.H. 326, 461 A.2d 117, 119 (1983); McGranahan v. Dahar, 119 N.H. 758, 408 A.2d 121, 124 (1979). . Although the hearing was technically an administrative adjudication, we use the phrase "judicial proceeding” in accordance with the New Hampshire Supreme Court’s language from its case law and the Restatement (Second) of Torts. . The defendants in the trial court also raised absolute witness immunity as a defense, but the trial court did not address this defense in its decision, disposing all of the state law claims under New Hampshire’s official immunity doctrine. See Frost v. Sheehan, No. 216-2012-CV-00603, 2014 WL 10122655 (N.H. Super. June 9, 2014), . Beyond Frost, Reenstierna asks us to apply the holding of Stinson v. Gauger, 799 F.3d 833 (7th Cir. 2015), another § 1983 case, where the Seventh Circuit held that a pair of defendant-odontologists accused of falsifying their expert reports leading up to a murder prosecution could not assert absolute Witness immunity. Id. at 840-41. That holding was recently reaffirmed by the court sitting en banc. See 868 F.3d 516, 528-29 (7th Cir, 2017). Reenstierna’s reliance on this case, however, is similarly misguided. Stinson, like Frost, applies federal qualified immunity doctrine to a federal cause of action, let at 833. . Because our decision to certify, or not, must turn on the current state of New Hampshire law, our colleague’s lengthy discussion of Massachusetts law is not directly pertinent. As to the dangers that might be thought to attend absolute immunity, the Provencher court recognized that the protection applies "without inquiry into a defendant’s motives,” 711 A.2d at 255 (quoting McGranahan v. Dahar, 119 N.H. 758, 408 A.2d 121, 124 (1979)), but nonetheless chose to extend full immunity to certain pre-litigation communications to "further the goals of encouraging free and unfettered testimony during judicial proceedings,” id. at 256-57 (internal quotation marks omitted). . That the pertinent proceeding was "contemplated in good faith” is conceded in this case, and the good-faith requirement apparently was also undisputed in Provencher, as it was not discussed. . Currier wrote his report prior to New Hampshire amending the relevant section of its Code of Administrative Regulations. Because the relevant amendments only altered the section numbering and not the substance, we cite the relevant regulations in their current form. '