# United States Court of Appeals
## For the First Circuit

No. 00-2385

BRIAN KVORJAK,

Plaintiff, Appellant,

v.

STATE OF MAINE, STATE OF MAINE DEPARTMENT OF LABOR,
AND VALERIE R. LANDRY, COMMISSIONER OF THE STATE OF MAINE
DEPARTMENT OF LABOR,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Lynch, Circuit Judge,
Coffin, Senior Circuit Judge,
and Schwarzer, Senior District Judge.[*]

Daniel W. Bates for appellant.
Christopher C. Taub, Assistant Attorney General, with whom
G. Steven Rowe, Attorney General, and Susan P. Herman, Assistant
Attorney General, were on brief for appellees.

---

[*]Of the Northern District of California, sitting by
designation.

August 9, 2001

**COFFIN, <u>Senior Circuit Judge</u>.**  Appellant Brian Kvorjak

claims that his former employer, the Maine Department of Labor,

wrongfully failed to accommodate his disability when it refused

to allow him to work at home after his office closed and his

position was relocated to a distant facility.  The district

court granted summary judgment for the defendants on his federal

and state claims,[1] concluding that he had failed to offer

---

[1]  Appellant brought suit under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213, the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. §§ 4551-4633. The Supreme Court ruled earlier this year that the Eleventh Amendment immunizes states from claims for money damages under Title I of the ADA. <u>See</u> <u>Bd. of Trs. of the Univ. of Ala.</u> v. <u>Garrett</u>, 121 S. Ct. 955, 967-68 (2001); <u>Acevedo Lopez</u> v. <u>Police Dep't of Com. of P.R.</u>, 247 F.3d 26, 28 (1st Cir. 2001).  This case remains viable under both the MHRA and the Rehabilitation Act, however, and the standards applicable to each of the three statutes have been viewed as essentially the same.  <u>See</u> <u>Oliveras-Sifre</u> v. <u>P.R. Dep't of Health</u>, 214 F.3d 23, 25 n.2 (1st Cir. 2000); <u>Feliciano</u> v. <u>State of Rhode Island</u>, 160 F.3d 780, 788-89 (1st Cir. 1998); <u>Soileau</u> v. <u>Guilford of Maine, Inc.</u>, 928 F. Supp. 37, 45 (D. Me. 1996), <u>aff'd</u>, 105 F.3d 12, 14 (1st Cir. 1997).  Thus, while we explicitly refer to the ADA because it has been the primary focus in the litigation to this point, and because of the applicability of its accompanying body of recent case law, our discussion here in fact applies solely to the Rehabilitation Act and MHRA claims.

Similarly for the sake of simplicity, we generally refer to defendants collectively as "the State," although in addition to the State itself, appellant sued the Maine Department of Labor, and the department's commissioner, Valerie Landry.

-2-

evidence sufficient to demonstrate that he could accomplish "essential" aspects of his job at home.  See 42 U.S.C. § 12111(8).  After a close review of the record and caselaw, we affirm.

## I. **Factual Background**[2]

Appellant is partially paralyzed as a result of spina bifida, a condition he has had since birth.  The condition limits his ability to walk, causes problems with his bowels and bladder, and at times triggers pain when he sits, stands or lies down.  Despite these difficulties, appellant successfully worked for various state agencies in Maine for twenty-two years, the last seven and one-half as a claims adjudicator for the Department of Labor's Division of Unemployment Field Services (the "Division").  In that most recent position, he was assigned to an office in Rockland, Maine, a ten-minute commute from his home.

In the mid-1990s, the Division decided to cut expenses by closing fifteen field offices, including the Rockland office, and shifting services to three call centers in other parts of

---

[2] Portions of this background are drawn almost verbatim from the well stated "Facts" section of the magistrate judge's opinion.

-3-

the state. To assist with the transfer, the Division sent out two surveys asking employees if they would consider relocating to a call center. In both surveys, appellant indicated that he would be able to work in a call center and listed Bangor as his primary choice.

Before the transfer in 1997, however, appellant drove the ninety-minute commute from his home to Bangor on two consecutive days. The lengthy drive resulted in substantial pain. Realizing that he could not commute three hours every day, he applied for a disability pension and asked that he be permitted to use his accumulated sick time until his pension request was processed. The State denied his request to use sick time, and appellant contacted the Disability Rights Center (the "Center").

After consultation with the Center, appellant in May 1997 requested the accommodation of working at home on a full-time, permanent basis.[3] He supplemented his request with a letter from his physician stating that the commute to Bangor every day would have a detrimental impact on his health. The doctor also stated that "any effort that can be made to allow him to work locally would be highly appropriate and medically indicated."

---

[3] Appellant initially wrote to the Department of Labor that, in addition to working at home, he was "willing to consider any reasonable accommodations which will result in my continued employment," but the record reflects that he later rejected any option other than at-home work. See infra note 9.

-4-

The Division rejected appellant's request, stating that the Department of Labor had checked with the New England Business and Technical Assistance Center and the Equal Employment Opportunity Commission and had "concluded that commuting to the job is not a covered activity under [the] ADA." It noted that it had received other requests from Division employees to work at home because of the office consolidation, and had denied all of them. The State, however, did offer to pay relocation costs if appellant moved closer to a call center, a benefit provided to all re-assigned employees, and also offered to pay for temporary housing.[4] Appellant declined to move, and he was laid off on June 18, 1997. That same day, Kathleen Dunford, director of the Office of Human Resources for the Department, offered in a telephone conversation to assist him in finding another local job.

In October 1997, the State notified appellant of a job opening in Bangor for a claims adjudicator — the same position he had left four months earlier. Appellant expressed interest, but again requested the accommodation of working at home. The

---

[4] The State also was prepared to help arrange for support services during appellant's relocation, although it is not clear that this offer was communicated to him. In his deposition, he said he was unaware of an offer for relocation assistance beyond that received by other employees. The offer for temporary housing, however, was explicitly noted in a memorandum to an investigator for the Maine Human Rights Commission ("MHRC").

request again was denied. Appellant subsequently filed complaints with the MHRC challenging both the original layoff and the later failure to re-hire him. The State continued to maintain that it had no obligation to ameliorate appellant's commuting difficulties; in its view, he was no different from non-disabled employees who sought the same accommodation of working at home because of the inconvenience of relocating. See 5 M.R.S.A. § 4573-A ("This subchapter does not prohibit an employer from discharging . . . an individual with physical or mental disability . . . if the individual, because of the physical or mental disability, is unable to . . . be at, remain at or go to or from the place where the duties of employment are to be performed."). The MHRC investigator, however, without determining whether appellant could perform the essential functions of the job at home (relying on a supervisor's statement that the job could be restructured if the law required), found reasonable grounds to believe that appellant had been subjected to unlawful disability discrimination.

Appellant filed his lawsuit in June 1999, asserting that the State's rejection of his request to work at home violated federal and state disability laws. In a motion for summary judgment, the State argued that it was not obliged to accommodate appellant because his request to work at home

-6-

stemmed not from his disability but from a personal preference against moving, and it emphasized that appellant could not in any event perform the essential functions of the claims adjudicator position at home. The district court accepted the magistrate judge's recommendation that summary judgment be granted for defendants, and this appeal followed. We review the district court's decision de novo, assessing the facts in the light most favorable to appellant, the nonmoving party. Reed v. LePage Bakeries, Inc., 244 F.3d 254, 257 (1st Cir. 2001).

## II. **The Interactive Process**

Before delving into the substance of the accommodation issue, we address appellant's contention that the State violated the ADA by failing to utilize an informal, interactive process to make an individualized assessment of his needs and abilities. The statute's implementing regulations state that it "may" be necessary for an employer to initiate a dialogue with an employee in order to determine an appropriate accommodation. See 29 C.F.R. § 1630.2(o)(3). Courts have construed the regulation as imposing various levels of obligation. See Barnett v. United States, 228 F.3d 1105, 1111-14 (9th Cir. 2000) (en banc) (citing cases), petition for cert. granted in part sub nom US Airways v. Barnett, 69 U.S.L.W. 3665 (U.S. Apr. 16, 2001)

(No. 00-1250).[5] Even in the most rigorous version, however, such as the Ninth Circuit's "mandatory obligation" in all cases, see Humphrey v. Mem. Hosps. Ass'n, 239 F.3d 1128, 1137 (9th Cir. 2001), petition for cert. filed, 69 U.S.L.W. 3792 (U.S. June 13, 2001) (No. 00-1860), liability nonetheless depends on a finding that, had a good faith interactive process occurred, the parties could have found a reasonable accommodation that would enable the disabled person to perform the job's essential functions, see Humphrey, 239 F.3d at 1139; Barnett, 228 F.3d at 1115-16.

This court has not taken so categorical a stand on the interactive process, preferring instead to resolve the issue on a case-by-case basis. See Phelps v. Optima Health, Inc., 251 F.3d 21, 27 (1st Cir. 2001); Ward v. Mass. Health Research Inst., Inc., 209 F.3d 29, 33 n.4 (1st Cir. 2000); Jacques v. Clean-Up Group, Inc., 96 F.3d 506, 515 (1st Cir. 1996). Although we have noted that there may be situations in which failure to engage in the process "would constitute a failure to provide reasonable accommodation that amounts to a violation of the ADA," Jacques, 96 F.3d at 515; see also Garcia-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 648 n.12 (1st Cir.

---

[5] The Court granted certiorari to consider whether the ADA requires an employer to disregard its seniority system in reassigning a disabled employee who is seeking a reasonable accommodation.

-8-

2000) (reversing summary judgment for employer and granting judgment for employee where company had "simply rejected the request for the accommodation without further discussion," but not deciding the interactive process issue), we also consider such an omission "of no moment" if the record forecloses a finding that the plaintiff could perform the duties of the job, with or without reasonable accommodation, see Soto-Ocasio v. Fed. Exp. Corp., 150 F.3d 14, 19 (1st Cir. 1998).

This being the status of the law, appellant has failed to demonstrate an actionable failure to engage in interactive communication. As we explain in the following section, the record cannot support a finding that he is able to perform the essential functions of the claims adjudicator position at his home. In addition, we do not view the circumstances here to constitute the extreme failure to engage in meaningful dialogue that appellant attempts to depict. When appellant asked to work at home because of the new commuting distance, the State had no reason to suspect that his disability also posed issues related to office work. He had been performing the claims adjudicator position at the Rockland office with little or no accommodation for more than seven years,[6] and, indeed, the doctor who submitted

---

[6] Appellant stated that he never requested any accommodation, while the State maintains that it allowed him to take more than the standard number of breaks during the day.

a letter of support for his request saw "[no] problem with him engaging in the type of activities he has been doing . . . ."[7]

In a setting of institutional change, with requests to work at home from other employees also seeking to avoid the commute, and after inquiry into statutory requirements,[8] the State's decision to reject an accommodation based on appellant's commute does not demonstrate a disregard for its obligations under the ADA. It is unsurprising that state officials would out-of-hand reject such an accommodation if it were <u>not</u> required by the ADA, out of a legitimate concern that allowing him such an arrangement would set a precedent for other employees.

Moreover, the State did communicate with appellant, making efforts to accommodate his disability with offers to help him both relocate and search for a new job in the Rockland area. In addition, after the MHRC's adverse finding in December 1998, the Department of Labor offered him a job in an office in Rockland. By that time, however, appellant felt he could no longer work in

---

[7] Another of appellant's doctors, Stephan Bamberger, testified in his deposition in November 1999 that there was no medical reason why he could not move to Bangor.

[8] We do not address here whether the advice given to the State – that the ADA does not cover commuting issues – was correct.

an office,[9] reflecting a shift in his focus from the single issue of his inability to commute to the additional problems presented by office work.  The State, however, also had gone beyond the issue of the commute to assert that the essential functions of appellant's job could not be performed at his home.

This is not to say that the State's behavior was ideal.  A face-to-face discussion might have allowed a more complete understanding of the needs and issues on both sides and avoided appellant's understandable sense of frustration and ill treatment.[10]  Appellant, too, however, must bear some responsibility for inadequate communication.  His counsel at oral argument made clear that his exceptional job performance for at least a portion of his tenure as a claims adjudicator was

---

[9] In his deposition, he stated that he learned from a medical consultation that continued full-time office work would accelerate his physical deterioration.  It was at that time, he said, "when I made the firm determination that I would not work again unless it was in the home."  Dr. Stephan Bamberger testified in deposition that a ten-minute commute – as appellant had had in Rockland – would not significantly affect the longevity of his working life, but that working in an office would pose difficulties because of his pain and incontinence.

[10] For example, the State raised concerns about confidentiality and expense related to at-home work, but did not fully explore them with appellant or his counsel.  Similarly, the State internally concluded before rejecting appellant's request to work at home that the essential functions of a claims adjudicator could not be performed at home, but it did not address that issue in its communications with appellant or his counsel until much later.

not without significant physical sacrifices.  Yet, so far as the record shows, the State had no reason to know of the extraordinary measures he had been taking to minimize the difficulties of working at the Rockland office.  See Reed, 244 F.3d at 261 (employee's request for accommodation must be "'sufficiently direct and specific'" to provide employer with notice of disability-based need); EEOC Interpretive Guidance, 29 C.F.R. Pt. 1630, app. at § 1630.9 ("In general, . . . it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed.").[11]  Had the State understood at the outset that appellant's need for accommodation was not, in fact, limited to commuting, there is no reason to doubt that the interaction would have progressed differently.

In sum, the circumstances here do not show an egregious failure to engage in the interactive process.  We now turn to consider whether the law required the State to provide appellant the accommodation of working at home.

### III. Essential Functions and Reasonable Accommodation

To obtain relief under the ADA, a plaintiff must demonstrate that:

---

[11] We recognize that at least some of appellant's silence stemmed from a desire to retain a level of privacy concerning his physical difficulties.  An employer, however, cannot be held responsible for knowing information about a disability that an employee deliberately chooses to withhold.

> (1) he was disabled within the meaning of the Act; (2) he was a qualified individual, i.e. able to perform the essential functions of the position with or without reasonable accommodation; and (3) he was discharged because of his disability.

Ward, 209 F.3d at 33.  The State concedes that appellant meets the statutory definition of disability.  The dispute centers on the second inquiry, whether he was a qualified individual under the ADA.[12]  The particular question we face here is whether appellant can "perform the essential functions of the position" if given the accommodation he seeks, working at home.  The district court concluded as a matter of law that he could not, based on the State's evidence that several important functions performed by claims adjudicators could not be accomplished in appellant's home.  Appellant contends that the State both underestimates what reasonably can be done in a home setting and improperly characterizes as "essential" certain functions that require an office setting.

We recently have confirmed that the plaintiff bears the burden of proposing an accommodation that would enable him to perform his job effectively and is, at least on the face of things, reasonable.  Phelps, 251 F.3d at 26; Reed, 244 F.3d at 258.  This necessarily entails a showing that the accommodation

_____

[12]  Because we conclude that appellant fails to establish that he is a qualified individual, we, like the district court, do not reach the third element of the prima facie case.

-13-

"would effectively enable [him] to perform [his] job," <u>Reed</u>, 244 F.3d at 259.  As a starting point, therefore, appellant must offer evidence that he can perform the essential functions of a claims adjudicator at home.  This turns out to be both the beginning and the end of our analysis.

An "essential function" is a fundamental job duty of the position at issue.  <u>See</u> <u>Ward</u>, 209 F.3d at 34; 29 C.F.R. § 1630.2(n)(1).  The term does not include "marginal" tasks, but may encompass "individual or idiosyncratic characteristics" of the job, <u>Ward</u>, 209 F.3d at 34 (quoting <u>Laurin</u> v. <u>Providence Hosp.</u>, 150 F.3d 52, 56-57, 59 n.6 (1st Cir. 1998)).  In the absence of evidence of discriminatory animus, courts generally give "substantial weight" to the employer's judgment as to what functions are essential.  <u>Id.</u>; <u>see</u> <u>also</u> 42 U.S.C. § 12111(8).  Other evidence also is relevant, including: "written job descriptions, consequences of not requiring the function, work experience of past incumbents, and work experience of current incumbents."  <u>Ward</u>, 209 F.3d at 34 (citing 29 C.F.R. § 1630.2(n)(3)).

The record contains both a "Task Statement" for the claims adjudicator position at a processing center and a list labeled "Essential Functions of a Claims Adjudicator," the latter of which is simply a shortened version of the former.  The task

statement contains nine items, and six of them are identified as essential functions in the other document. The first three "essential" tasks generally describe the job of adjudicating claims - what we shall call the "adjudicator function"[13] — and the other three involve the provision of information and guidance to a variety of individuals both inside and outside the Division - in our shorthand, the "advisor function."[14]

---

[13] These three tasks are:

1. Interview claimants, employers, and witnesses by telephone to obtain relevant facts in order to determine a claimant's eligibility for compensation and which employer account, if any, is to be charged.

2. Writes clear and concise decisions in order to enable interested parties to determine the basis for unemployment compensation benefits determination and which employer account, if any, will be charged.

3. Enters decisions and related data into p.c. in order to produce a written record of the decision.

[14] These three duties are:

4. Explains laws, regulations, commission rules, precedents, and department policies regarding eligibility, disqualifications and appeals to claimants, employers, and the general public in order to provide information on the program.

5. Discusses disposition of the claim with claimants, employers, and/or their authorized representatives in order to provide information on the basis for the determination and on the process of initiation of an appeal.

6. Assists claims specialists and employment security aides in functions of their respective classifications

-15-

Appellant focuses on the adjudicator function and maintains that there is at least a factual dispute as to whether it can be performed by him at his home.  He plausibly contends that he could conduct interviews by telephone at home, write decisions, and enter all necessary data into a personal computer.  Although the State has raised concerns about the confidentiality of records that might be needed in the decision-making process, its counsel acknowledged at oral argument that that concern perhaps could be met if it were the only obstacle.  Indeed, it appears that other Department of Labor decision-makers routinely work at home with confidential documents, albeit not on a full time basis.  Moreover, there is no evidence that the benefits decisions must be made on extremely tight deadlines, and gaining access to records kept at the office or within the Division's secure computer system would thus seem logistically feasible.[15]

which relates [sic] to adjudication activities.

[15] On the other hand, the State maintains that such research would be difficult for an at-home employee to manage without imposing an undue burden on employees at the office because it requires physical access to paper files, as well as access to the unemployment insurance database.  An at-home employee thus would have to rely on others to find, copy, and mail needed documents.  As of December 1999, the Division's call centers were supported by only two clerical staff people.  Laura Boyett, director of the Division, reported in an affidavit that both individuals are "fully occupied with their present duties and do not have time to take on additional duties."  See 42 U.S.C. § 12112(b)(5)(A) (an employer need not provide an accommodation that would impose "an undue hardship").

Although adjudicating claims may be the core function of appellant's former position — hence its "claims adjudicator" title — the advisor function looms large in both the written task statement and the testimonial evidence presented by the State. In a lengthy affidavit, Boyett described the transition of the Division's services from decentralized field offices, such as the one in which appellant worked in Rockland, to the "call center model," which consolidated the Division's operations in three offices serving a statewide clientele. In the call center system, unemployment claims are submitted via telephone and routed automatically to one of the three centers in a manner intended to equalize workloads among the locations.

Claims adjudicators are "the most senior, non-supervisory technical resource" at the call centers, and one function resulting from that experienced status is to serve as "Adjudicator of the Day" approximately once a week. Boyett explained the role as follows:

> Adjudicators of the Day are the primary people responsible for trouble-shooting and problem resolution for that day. Their names are posted in visible locations within the call centers so that claims staff know who to go to with questions and problems. They remain accessible so that they can help other employees at the other employees' workstations if needed. For example, claims adjudicators might help another employee conduct research on the computer database, plug into an employee's telephone to assist with a telephone call, or take a portion of a call at their own workstation

-17-

to resolve a problem before transferring the call back to the other employee or terminating the call.

Boyett further stated that, since the change to call centers, claims adjudicators have more often served as a technical resource for other employees because the number of supervisors was reduced from seventeen to six statewide, making them less available for individual questions. Although some of this assistance could be provided by phone, "it is primarily provided in person because it usually requires jointly reviewing written materials, including forms, documents, law sections, primary commission cases and claim cards." Claims adjudicators also participate in the technical training of claims staff at the call centers.[16]

In essence, Boyett's affidavit depicts claims adjudicators as key players on a team whose function is to provide information and assistance to the public in utilizing the unemployment insurance system. The system often relies on on-the-spot collaborative efforts among the call center's various employees, and claims adjudicators are particularly vital

---

[16] Boyett stated that "[t]he call center environment provides an ability to offer staff training more frequently because each center has the capability of covering for another center while training is taking place. Staff training is now given high priority because one of the goals of the call center transition is to improve consistency in procedures and application of law throughout the state."

participants because of their high level of technical skill. See 29 C.F.R. § 1630.2(n)(2)(ii) (a job function may be considered essential "because of the limited number of employees available among whom the performance of that job function can be distributed"). The State's position is that, by definition, the advisor function includes training and joint problem-solving that could not be accomplished effectively by a claims adjudicator based outside of the call center. See EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, 1999 WL 33103142, at *34 n.93 (March 1, 1999) ("Courts that have rejected working at home as a reasonable accommodation focus on evidence that personal contact, interaction, and coordination are needed for a specific position.") (citing cases).[17]

In response to the State's evidence that the advisor function is an "essential" part of a claims adjudicator's job,

---

[17] We have focused on the claims adjudicator's duties as advisor to other call center staff because that role, by itself, demonstrates that the position cannot be performed at home. Other aspects of the advisor function – specifically, providing explanations and information to the public and to those using the unemployment compensation system – might be feasible in a home if the technology cost were not prohibitive. There is much discussion in the record about the possibility of connecting appellant's home phone to the Division's call center, but we need not explore that issue because of our conclusion that the record otherwise unequivocally proves that a claims adjudicator must work at the center to perform essential aspects of the advisor function.

appellant offers no specific facts showing that this role either is not essential or could be performed by him at home. He emphasizes a statement made by Gail Thayer, director of the Bureau of Unemployment Compensation (which includes the Division), that "if the law requires it, the [State] could restructure Mr. Kvorjak's job to enable him to work at home." Thayer did not state, however, that the resulting position would include all of a claims adjudicator's essential functions, and, indeed, she testified at her deposition that she did not, in fact, envision that such a restructuring would retain all of the important elements of appellant's job. The law does not require an employer to "accommodate a disability by foregoing an essential function of the position or by reallocating essential functions to make other workers' jobs more onerous." Feliciano, 160 F.3d at 785; see also Phelps, 251 F.3d at 26; Laurin, 150 F.3d at 56, 60.

Appellant's other contentions regarding the State's evidence are no more forceful. He complains that numerous functions listed as essential in the State's summary judgment materials were both new to the case and peripheral to the claims adjudicator's job, and their legitimacy must be resolved by a factfinder. The simple response to the tardiness claim is that the advisor role derives directly from the list of duties in the

Task Statement,[18] which was used as an exhibit before the MHRC. Although the Boyett affidavit spells out in detail for the first time the many ways in which a claims adjudicator is expected to perform the advisor function, the possibility that a particular advisory task is unimportant or reasonably could be performed at an individual's home does not undermine the State's position that the claims adjudicator's in-office role as educator/trainer/advisor is essential.

Appellant offers no evidence suggesting that, despite the written task statement and the departmental expectations outlined in the Boyett affidavit, the advisor function in actuality comprises an insignificant portion of a claims adjudicator's job. His own knowledge of the position is limited to his experience working in a field office and thus provides an insufficient basis to rebut Boyett's assertion that the advisor function became more important after the consolidation of

---

[18] Item 6 on the list of essential functions, see note 14 supra, refers to the assistance provided by claims adjudicators to other claims staff members. This item embraces most of the supervisory and educational tasks that Boyett attributed to claims adjudicators.

services in call centers.[19] Appellant could have, but did not, depose current claims adjudicators about their duties.

Finally, appellant tries to make much of the fact that two Department of Labor employees have been permitted to work at home. The evidence shows significantly distinguishable circumstances: (1) the employees, who both experienced allergic-type reactions to substances in their office building, are being permitted to work at home only until the Department is able to construct a "clean room" at the workplace; and (2) neither is a claims adjudicator — one's job is to organize files and the other is a tax specialist whose primary duty is to call employers who owe unemployment taxes. The fact that these employees work at home lends no support to appellant's contention that he could perform the essential functions of a claims adjudicator at home.

## IV. Conclusion

The record demonstrates without meaningful dispute that the essential functions of a claims adjudicator cannot be performed at an individual employee's home. We therefore affirm the grant of summary judgment for defendants.

---

[19] In his answers to defendants' interrogatories, appellant acknowledged that even at the field office he would "cover for other workers by performing the duties of a receptionist and covered for my boss and others, etc."

<u>Affirmed.</u>

Dissent follows.

**Schwarzer, <u>Senior District Judge</u>**, dissenting:

I respectfully dissent. The problem with this case is that the State had made up its mind to reject Kvorjak's request to work at home without even considering whether a reasonable accommodation could be worked out. Thus, in responding to his initial request, the State rejected it on the ground that "commuting to the job is not a covered activity under ADA."

It did not consider any of Kvorjak's medical information (nor did it request any), and it did not conduct a cost assessment of his working from home. Instead, the State advised Kvorjak's counsel that it was not interested in having him work at home, and it is clear from the record that no accommodation was ever considered. Until the commencement of the litigation, the State adhered to this initial position. It was only when the State filed its motion for summary judgment that it presented, by way of the affidavit of Laura Boyett, a litany of reasons why Kvorjak would not be able to perform the essential functions of his job at home. This court has said that "[a]n employee's request for a reasonable accommodation requires a great deal of communication between the employee and employer . . . both parties bear responsibility for determining what accommodation is necessary." <u>Criado</u> v. <u>IBM Corp.</u>, 145 F.3d 437, 444 (1st Cir. 1998) (quoting <u>Bultemeyer</u> v. <u>Fort Wayne Cmty.</u>

-24-

Sch., 100 F.3d 1281, 1285 (7th Cir. 1996)); see also Garcia-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 648 n.12 (1st Cir. 2000). Here there was essentially none.

This is not a case in which the omission of such communication can be said to be of no moment. Cf. Soto-Casio v. Fed. Express Corp., 150 F.3d 14, 19 (1st Cir. 1998). The State does have a duty to "mak[e] reasonable accommodations . . . unless [it] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." 42 U.S.C. § 12112(b)(5)(A). Kvorjak's supervisor's testimony on deposition, that if the law required his job could be restructured to enable him to work at home and confidentiality concerns and connections with the call center could be resolved, raises a triable issue. Moreover, the State's adamant refusal from the outset to consider and discuss accommodation raises a triable issue as to whether it complied with its obligation under the ADA. What the State did here is precisely what the employer did in Garcia-Ayala: "It simply rejected the request for the accommodation without further discussion and it did so without pointing to any facts making the accommodation harmful to its business needs." Garcia-Ayala, 212 F.3d at 648 n.12. This "may well be [a] situation[] in which the employer's

-25-

failure to engage in an informal interactive process would constitute a failure to provide reasonable accommodation that amounts to a violation of the ADA." Jacques v. Clean-Up Group, Inc., 96 F.3d 506, 515 (1st Cir. 1996).[1]

I would reverse and remand for trial.

---

[1]I note parenthetically that the request to work at home cannot be regarded as outlandish. See Langon v. Dep't of Health and Human Servs., 959 F.2d 1053, 1060 (D.C. Cir. 1992) (holding that agency must consider accommodating a computer programmer with multiple sclerosis by allowing her to work at home); see also Carr v. Reno, 23 F.3d 525, 530 (D.C. Cir. 1994).