# United States Court of Appeals
## For the First Circuit

No. 08-2423

KATHARINE RICHARDSON,

Plaintiff, Appellant,

v.

FRIENDLY ICE CREAM CORPORATION,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Lynch, Chief Judge,
Ebel[*] and Lipez, Circuit Judges.

Julie D. Farr, with whom Charles E. Gilbert was on brief, for appellant.
Christopher T. Vrountas for appellee.

February 5, 2010

---

[*]    Of the Tenth Circuit, sitting by designation.

**LIPEZ**, **Circuit Judge**.  Appellant Katharine Richardson alleges that her former employer, appellee Friendly Ice Cream Corporation ("Friendly's"), discriminated against her in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213, and the Maine Human Rights Act ("MHRA"), 5 Me. Rev. Stat. §§ 4551-4634, by failing to accommodate her disability and by terminating her employment because of that disability.  The district court entered summary judgment for Friendly's, holding that Richardson is not covered by the ADA or the MHRA because she is not capable of performing the essential functions of her position, with or without a reasonable accommodation, and hence is not a "qualified individual."  We affirm.

**I.**

Friendly's, a Massachusetts-based restaurant chain, hired Richardson as an assistant manager of its Ellsworth, Maine store in 2000.  Richardson worked alongside one other assistant manager during the period of her employment.  Both assistant managers reported to Tina Emery, the general manager of the Ellsworth restaurant, who in turn reported to Todd Mosher, the district manager.  Between 2000 and 2006, Richardson performed both administrative and manual tasks as part of her job.  Among other duties, she regularly interacted with customers, supervised other employees and inspected their work, carried plates to customers, ordered new supplies, unloaded new supplies as they were delivered,

-2-

operated the grill and the deep-frying machine, and cleaned the restaurant. Because the general manager and the other assistant manager preferred to work the opening and closing shifts, Richardson typically worked the mid-day shift, which was the least physically demanding of the three shifts.

In January 2006, Richardson began to experience severe pain in her right shoulder. She claims, and Friendly's does not dispute, that the pain was caused by the manual tasks that she had been performing at work, such as working at the grill and scooping ice cream. When she reported her injury to Friendly's that same month, the company sent her to see a physician at Mednow Clinic in Ellsworth. The physician diagnosed Richardson's pain as shoulder impingement syndrome, prescribed an anti-inflammatory medication, and recommended that Richardson discontinue all grill work and other tasks that involved lifting objects heavier than ten pounds with her right arm.

Between January 2006 and September 2006, Richardson continued to work at Friendly's without missing any days. Although the pain in her shoulder impeded the full use of her right arm, she claims that she was able to modify her work behavior during that period to enable her to perform most of the tasks that she had previously performed. For example, when cooking French fries in the deep-frying machine, she would cook small quantities at a time and would remove the cooked product with tongs rather than by

-3-

lifting the entire basket as she formerly did. She admits that she was unable to perform certain tasks such as mopping the floor and lifting heavy bags of trash, but she says that there were typically other employees on duty who were able to perform those tasks. She adds that she had been reprimanded before her injury for failing to delegate manual tasks to other restaurant employees.

In September 2006, Richardson took a leave of absence to undergo shoulder surgery. Following the surgery, Richardson continued to experience intense pain in her shoulder and was unable to return to work immediately. At that point, Friendly's workers' compensation administrator retained a nurse case manager, Debra Dwyer, to facilitate Richardson's recovery and return to work. Dwyer was in regular contact with Emery, the general manager, during the period after Richardson's surgery. Emery testified at her deposition that she and Dwyer discussed Richardson's anticipated return date, Richardson's anticipated medical restrictions, and certain accommodations and transitional job duties that might have enabled Richardson to work within her medical restrictions.

Based on Richardson's post-operative medical evaluations, Emery and Dwyer initially assumed that Richardson would be able to return to work near the end of October 2006. Richardson did not improve as expected, however. Her surgeon concluded that she had "no work capacity," and Richardson remained on leave throughout

-4-

October and November. On December 7, the surgeon estimated that Richardson would be able to return to work on January 8, 2007. Dwyer gave that projected return date to Emery, who then conveyed the information to district manager Mosher.

Three days later, Mosher sent the following e-mail to Theresa Marino, a human resources manager at Friendly's corporate headquarters:

> Theresa -
>
> I'm sorry -- but I need your help. Can you give us some guidance on Kathy Richardson? As you know she is the Manager from Ellsworth #1241 that has been out with a shoulder injury from lifting French fry baskets.
>
> She is supposed to be released the first week of Jan. after a second opinion last week revealed the opposite of what the original physician said.
>
> I would prefer to not bring her back if at all possible (as she is just going to do the same thing in '07).
>
> Can you help guide us on this?
>
> P.S. Please don't cc the restaurant on any of this -- as Tina Emery (GM) is on vacation.
>
> Thanks!

Diana Beach, a representative from Friendly's compensation and benefits department, responded that same day:

> She has reached the end of her FML [family and medical leave] with Friendly as of 12/3/06 which means that our obligation of leaving her job open has ended. Due to the fact that she is out on WC [workers' compensation], you may want to check with the legal department to see

-5-

> if you have to bring her back.  I will be
> sending her out COBRA for her medical/dental
> insurance.

There is some dispute about the sequence of events that followed this exchange of e-mails.  Friendly's claims that it decided to terminate Richardson's employment on December 14, 2006 because she had remained on leave beyond the time reserved for her by the Family and Medical Leave Act, 29 U.S.C. §§ 2601-2654.  Diana Beach sent Richardson a letter that day notifying Richardson of her right to continue her group insurance coverage.  Richardson acknowledges receiving the letter but says that she did not interpret it to be a notice of termination.  When she questioned Emery and Beach about the letter, neither explained that she had been terminated.  Dwyer also told Richardson that she and Emery continued to correspond about Richardson's condition after that date, giving Richardson the impression that she was still expected to return to work.

In any case, Richardson's physician finally signed a work release on January 4, 2007.  Although he permitted her to return to Friendly's, he prohibited her from performing repetitive activity with her right arm and from lifting objects weighing more than five pounds.  Richardson delivered the release to the Ellsworth restaurant that same day.  Four days later, on January 8, Mosher telephoned Richardson to notify her that she had been terminated.  According to Richardson, Mosher said: "Because you are still

-6-

disabled and you have gone over your thirteen weeks of family medical leave, we choose to terminate you."

On January 17, Richardson filed a charge of discrimination with the Maine Human Rights Commission ("MHRC") and the Equal Employment Opportunity Commission ("EEOC"). She alleged in her charge that Friendly's reliance on the Family and Medical Leave Act was pretextual and that Friendly's discharged her solely because of her disability. The MHRC issued a right-to-sue letter, and on October 31, 2007 Richardson filed a complaint in Maine Superior Court asserting claims against Friendly's and its workers' compensation administrator for violation of the ADA and the MHRA and for tortious interference with contract. The defendants then removed the action to federal court.

Friendly's moved for summary judgment after the close of discovery, claiming that (1) Richardson was not eligible for relief under the ADA or MHRA because she had not shown that she was qualified for her position at the time of her discharge, and (2) she was terminated in accordance with Friendly's generally applicable leave policy rather than on the basis of disability. The motion was referred to a magistrate judge, who recommended that summary judgment be granted on the first ground. In a brief order, the district judge approved the magistrate judge's reasoning and

granted Friendly's motion. Judgment was entered that same day,[1] and this appeal followed.

## II.

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We review the district court's grant of summary judgment de novo, drawing all reasonable inferences in Richardson's favor. Franklin Memorial Hosp. v. Harvey, 575 F.3d 121, 125 (1st Cir. 2009).

Title I of the ADA prohibits covered entities from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).[2] Richardson alleges that Friendly's discriminated against her on the basis of disability when it discharged her. In order to prevail on that claim at trial, she must show: (1) that she was disabled within the meaning

---

[1]    Richardson voluntarily dismissed her claims against the workers' compensation administrator, including the claim for tortious interference with contract.

[2]    The parties assume that the Maine Human Rights Act is coextensive with the ADA in all material respects. We do not question that assumption here.

of the ADA; (2) that she was qualified for her position; and (3) that Friendly's discharged her because of her disability. García-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 646 (1st Cir. 2000) (citing Criado v. IBM Corp., 145 F.3d 437, 441 (1st Cir. 1998)).

Friendly's has not disputed Richardson's disability status. It moved for summary judgment on the grounds that Richardson was not qualified for her position as an assistant manager and that Friendly's did not discharge her because of her disability. The district court granted the motion on the first ground and found it unnecessary to address the second. Richardson argues on appeal that there is a genuine issue of material fact as to both issues. Because we agree with the district court that no reasonable jury could conclude that Richardson was qualified for her position, we do not address her second argument about Friendly's motive for terminating her.

To establish that she was qualified, Richardson must demonstrate, first, that she had the necessary "skill, experience, education, and other job-related requirements" for the assistant manager position and, second, that she was able to perform the "essential functions" of the position "with or without reasonable accommodation." Mulloy v. Acushnet Co., 460 F.3d 141, 147 (1st Cir. 2006) (quoting García-Ayala, 212 F.3d at 646). Friendly's does not suggest that Richardson lacks the basic skill, experience,

and education for the assistant manager position.  We therefore turn to the second requirement, and our assessment of whether Richardson could perform the essential functions of the assistant manager position with or without reasonable accommodation.

## A.  The Essential Functions of Richardson's Position

To determine whether Richardson was able to perform the essential functions of her position, it is necessary to identify those functions.  Precision is critical, as the level of generality at which the essential functions are defined can be outcome determinative.  See, e.g., Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 27-28 (1st Cir. 2002); Skerski v. Time Warner Cable Co., 257 F.3d 273, 280-81 (3d Cir. 2001).

### 1.  Legal Framework

An essential function is, at its most basic level, one that is "fundamental" to a position rather than "marginal." Kvorjak v. Maine, 259 F.3d 48, 55 (1st Cir. 2001).  The ADA's implementing regulations elaborate on this idea, listing three nonexclusive reasons why a job function may be considered essential: (1) the position exists for the purpose of performing the function; (2) there are a limited number of employees among whom responsibility for the function can be distributed; and/or (3) the function is highly specialized and the incumbent was hired for his or her expertise or ability to perform it.  29 C.F.R. § 1630.2(n)(2); see also EEOC Interpretive Guidance on Title I of

-10-

the ADA, 29 C.F.R. pt. 1630, app., § 1630.2(n) [hereinafter EEOC Interpretive Guidance] (illustrating the three reasons).[3]

Within these contours, "the complex question of what constitutes an essential job function involves fact-sensitive considerations and must be determined on a case-by-case basis." Gillen, 283 F.3d at 25. Among the types of evidence bearing on the analysis are:

> [1] The employer's judgment as to which functions are essential;
>
> [2] Written job descriptions prepared before advertising or interviewing applicants for the job;
>
> [3] The amount of time spent on the job performing the function;
>
> [4] The consequences of not requiring the incumbent to perform the function;
>
> [5] The terms of a collective bargaining agreement;
>
> [6] The work experience of past incumbents in the job; and/or
>
> [7] The current work experience of incumbents in similar jobs.

---

[3] The EEOC Interpretive Guidance was published as an appendix to the regulations implementing Title I of the ADA. See Equal Employment Opportunity for Individuals With Disabilities, 56 Fed. Reg. 35,726, 35,739 (July 26, 1991) (codified at 29 C.F.R. pt. 1630, app.). We have often looked to it in construing the ADA. See, e.g., Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 104 (1st Cir. 2007); Grenier v. Cyanamid Plastics, Inc., 70 F.3d 667, 672 (1st Cir. 1995).

-11-

29 C.F.R. § 1630.2(n)(3).  It is the employer's burden "to come forward with some evidence" that a particular function is essential, Tobin v. Liberty Mut. Ins. Co. ("Tobin I"), 433 F.3d 100, 107 (1st Cir. 2005), but the plaintiff always has the ultimate burden of proving that she is a qualified individual, Laurin v. Providence Hosp., 150 F.3d 52, 59 (1st Cir. 1998).

"The purpose of these provisions is not to enable courts to second-guess legitimate business judgments, but, rather, to ensure that an employer's asserted requirements are solidly anchored in the realities of the workplace, not constructed out of whole cloth." Gillen, 283 F.3d at 25.  The ADA expressly provides that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job."  42 U.S.C. § 12111(8).  Consistent with that directive, "we generally give substantial weight to the employer's view of job requirements." Mulloy, 460 F.3d at 147 (quoting Ward v. Mass. Health Research Inst., Inc., 209 F.3d 29, 34 (1st Cir. 2000)).  We have made it equally clear, however, that "the employer's good-faith view of what a job entails, though important, is not dispositive." Gillen, 283 F.3d at 25.

## 2. Analysis

Richardson argues that her sole essential function was to "oversee the operation of the restaurant and ensure that it ran smoothly." Friendly's disagrees, relying heavily on a written job description for the assistant manager position as proof that it was essential for Richardson to be able to perform a number of predominantly manual tasks as well.

The six-page job description is divided into multiple sections.[4] The first substantive section, labeled "Primary Task," provides:

> The primary function of this position is to assist the General Manager with assigned administrative and operational shift duties, provide guidance and direction to restaurant personnel, oversee, direct and assist in kitchen, dining and take-out operations, facilitate production and customer service, ensure safety regulations and quality standards are maintained and that customer satisfaction is achieved.

The following section, labeled "Essential Functions," lists thirteen general categories of job duties. Among other things, it reiterates that an assistant manager must "[r]un shifts, oversee, direct and assist in kitchen, dining and take-out operations to facilitate production and customer service." The remaining

_____

[4] Richardson has objected to the job description as inadmissible hearsay. The district court overruled her objection on the ground that the job description was properly authenticated as a business record. See Fed. R. Evid. 803(6). We agree that the affidavit submitted by Friendly's is adequate for that purpose. The district court did not err in admitting the job description.

-13-

sections of the job description are significantly more detailed, listing specific tasks and physical movements that the assistant manager may be asked to perform.

Without addressing whether each individual task listed in the written job description is an essential function of the assistant manager position, we conclude that it was essential for an assistant manager to "assist in kitchen, dining and take-out operations to facilitate production and customer service." We further conclude, on the basis of the overwhelming weight of the summary judgment evidence, that an assistant manager had to be capable of performing a broad range of manual tasks in order to perform that function.

It is undisputed that Richardson was often required to assist her subordinates in performing their jobs and to fill in for them as necessary. Richardson admitted as much in her deposition testimony:

> Q: And part of your job was, basically, to be able to do any of those jobs in the restaurant that you were trained to do?
>
> A: Yes. I think. Ideally, I'm not -- if I'm a manager, I am not going to be in the grill area trying to run the floor and take care of a customer . . . . I needed to be able to do everything so that I could train . . . and that I could effectively take care of the restaurant.
>
> Q: Right. And also to fill in when needed --

-14-

A:      Yes.

Q:      -- if you needed [to] fill in, right?
        So if you needed to fill in at the
        grill, you'd fill in at the grill.

A:      Yes.

Q:      And if you needed to fill in to help in
        the dining room --

A:      Yes.

Richardson described in detail the duties she was often required to perform, which included cooking, cleaning, serving food, and unloading delivery trucks. Richardson's husband and physician confirmed in their testimony that her job had a substantial physical component. Indeed, the very premise of Richardson's workers' compensation claim was that her injury was caused by the heavy, repetitive manual tasks that she performed at Friendly's on a daily basis. All of this evidence indicates that Richardson spent a substantial amount of time on the job performing manual tasks around the restaurant. See 29 C.F.R. § 1630.2(n)(3)(iii) ("Evidence that a particular function is essential includes . . . [t]he amount of time spent on the job performing the function . . . .").

The written job description also indicates that it was essential for an assistant manager to physically assist in restaurant operations. See 29 C.F.R. § 1630.2(n)(3)(i)-(ii) ("Evidence that a particular function is essential includes . . . [t]he employer's judgment as to which functions are

-15-

essential [and w]ritten job descriptions prepared before advertising or interviewing applicants for the job . . . ."). As we have noted, that function is listed as both a "Primary Task" and an "Essential Function." Other manual tasks are listed in the "Essential Functions" section as well: "[r]eceive deliveries, unload products from the trailers with conveyor, hand-truck or by hand as required"; "[t]ransport stock items to the appropriate storage area cooler, freezer or dry storage area as required"; and "clean and secure facility and all equipment." When Richardson was asked at her deposition whether the "Essential Functions" section of the job description accurately described her responsibilities as an assistant manager, she replied, "I guess so."

The "Task Analysis" section of the job description lists other duties that the assistant managers were expected to perform: "physically assist and/or perform kitchen, dining and take-out operations"; "cook food items on the grill, in the Fry-o-lator and [in the] microwave oven"; "deliver prepared meals, beverages, and dessert items to customers"; "clean and reset tables"; "bus dishware and utensils to the dishwashing area"; "load and operate the dishwasher"; "perform general housekeeping duties"; and "clean and secure facility, the grounds and all equipment." Again, Richardson admitted at her deposition that this list accurately described her operational duties.

-16-

In an attempt to rebut this evidence, Richardson argues that she "was an assistant manager and thus her primary function was not to do each job itself -- the restaurant specifically employed cooks, wait staff, dishwashers, and other employees to do those jobs. Rather, her primary function was to oversee the operation of the restaurant and ensure that it ran smoothly." To the extent that Richardson means to suggest that the designation of her position as "assistant manager" implies that her essential functions were limited to managing other employees, we reject that argument. It is not uncommon for "managers" of small restaurants and retail stores to spend little of their time managing others. See, e.g., Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1272-73 (11th Cir. 2008) (noting, in action under the Fair Labor Standards Act, that "store managers" spent "80 to 90% of the time performing manual labor").

Even assuming it is true that Richardson's "primary function" was to oversee restaurant operations, the point does not advance Richardson's case. The essential functions of a position are not limited to the "primary" function of the position. For example, we concluded in Kvorjak v. Maine, 259 F.3d at 56, 58, that it was essential for a claims adjudicator to be able to provide advice to other employees notwithstanding our recognition that the "core function" of the position was adjudicating claims. Similarly, the Tenth Circuit determined in Frazier v. Simmons, 254

-17-

F.3d 1247, 1259-61 (10th Cir. 2001), that it was essential for a criminal investigator to be capable of physically restraining violent individuals even though the primary functions of the investigator position (investigation and desk work) did not require physical exertion.

Richardson points out that some of her physical duties were reduced or shifted to other employees after she was injured in 2006. That evidence has minimal value, however. "[A] court must evaluate the essential functions of the job without considering the effect of [any] special arrangements." Phelps v. Optima Health, Inc., 251 F.3d 21, 25 (1st Cir. 2001); see also Laurin, 150 F.3d at 60-61 ("An employer does not concede that a job function is 'non-essential' simply by voluntarily assuming the limited burden associated with a temporary accommodation . . . ."). The voluntary accommodations that Friendly's made following Richardson's injury do not alter our assessment of the essential functions of the assistant manager position.[5]

Importantly, the evidence shows that there were a limited number of employees among whom the performance of the manual tasks at the Ellsworth restaurant could be distributed. See 29 C.F.R. § 1630.2(n)(2)(ii) ("[A] function may be essential because of the limited number of employees available among whom the performance of

---

[5]    We address in more detail below Richardson's contention that it was permissible for her to delegate manual tasks to other restaurant employees. See infra.

-18-

that job function can be distributed."). Tina Emery testified that during the slowest times of the year, eight to ten employees would be on duty over the course of an entire day. Richardson echoed this testimony, adding that only one of the three managers would be on duty at the beginning and end of each day. Richardson also testified that in the early mornings an assistant manager and a server would typically be the only employees on duty. At those times, the assistant manager would be responsible for preparing all of the food and the server would be responsible for interacting with the customers. This evidence supports a finding that manual duties were essential to Richardson's position. See Hirschhorn v. Sizzler Restaurants Int'l, Inc., 913 F. Supp. 1393, 1399 (D. Nev. 1995) ("[F]unctions that might not be considered essential if there were a larger staff may become essential because the staff size is small compared to the volume of work that has to be done."); EEOC Interpretive Guidance, § 1630.2(n) ("[I]f an employer has a relatively small number of available employees for the volume of work to be performed, it may be necessary that each employee perform a multitude of different functions. Therefore, the performance of those functions by each employee becomes more critical and the options for reorganizing the work become more limited.").[6]

---

[6] Of course, it does not follow that an otherwise essential job function may be deemed non-essential simply because there are a large number of employees available to perform it. A job

-19-

We conclude that any reasonable jury presented with the summary judgment record here would find that it was essential for Richardson to "assist in kitchen, dining and take-out operations,"[7] and that she had to be capable of performing a broad range of manual tasks in order to carry out that function. Especially during periods of light staffing, an assistant manager whose disability prevented her from performing a substantial number of the manual tasks that were part of the daily operations of the Ellsworth restaurant would not be able to fulfill one of her fundamental job duties.

**B. Richardson's Ability to Perform the Essential Functions of her Position without a Reasonable Accommodation**

Having identified the relevant essential function, we now turn to whether Richardson was able to perform that function without a reasonable accommodation. We must ask whether the summary judgment evidence would permit a jury to conclude that Richardson was capable of performing a sufficiently broad range of manual tasks to effectively "assist in kitchen, dining and take-out

---

function "may be considered essential for any of [the] reasons" listed in 29 C.F.R. § 1630.2(n)(2); however, none of those reasons, standing alone, is necessary to support a finding that a job function is essential.

    [7] The question whether a particular job function is essential is for the jury when there is sufficient evidence. See, e.g., Tobin v. Liberty Mut. Ins. Co. ("Tobin II"), 553 F.3d 121, 136 (1st Cir. 2009); Hamlin v. Charter Twp. of Flint, 165 F.3d 426, 430-31 (6th Cir. 1999); 3C Fed. Jury Practice & Instructions § 172.33 (5th ed. 2001 & Supp. 2009).

operations." See Miller v. Ill. Dep't of Corr., 107 F.3d 483, 485 (7th Cir. 1997) ("[I]f an employer has a legitimate reason for specifying multiple duties for a particular job classification . . ., a disabled employee will not be qualified for the position unless he can perform enough of these duties to enable a judgment that he can perform its essential duties.") (emphasis altered).

In attempting to show that she was able to perform a sufficiently wide range of manual tasks, Richardson focuses on the time period between her January 6, 2006 injury and her September 6, 2006 surgery. The premise of her argument is that her physical abilities as of her January 8, 2007 termination were roughly equivalent to her abilities during the pre-surgery period.[8] Cf. Land v. Washington County, Minn., 243 F.3d 1093, 1096 (8th Cir. 2001) ("An ADA plaintiff may not rely on past performance to establish that he is a qualified individual without accommodation when there is undisputed evidence of diminished or deteriorated

---

[8] In most cases, the relevant date for determining whether an individual is qualified for her position is the date of the adverse employment decision. See EEOC v. Stowe-Pharr Mills, Inc., 216 F.3d 373, 379 (4th Cir. 2000); EEOC Interpretive Guidance, § 1630.2(m). But cf. McKnight v. General Motors Corp., 550 F.3d 519, 522-28 (6th Cir. 2008) (discussing a circuit split over the relevant date for cases involving discrimination against a retired employee). The parties have presented conflicting evidence regarding the date of Richardson's termination. We use Richardson's proposed date, January 8, 2007, because it is supported in the record and is more favorable to her as the non-moving party below.

abilities."). Although it is not clear that Richardson had in fact recovered to her pre-surgery level by that date, we will assume for the purposes of this appeal that she had. Even so, we conclude that she has not shown that there is a genuine issue of fact regarding her ability to perform the necessary range of manual tasks.

It is undisputed that Richardson was not able to lift more than five pounds or engage in repetitive manual activity. She contends that she overcame these limitations by altering the manner in which she performed certain tasks. For example, she testified that she was able to cook French fries by cooking small quantities at a time and then removing cooked product with tongs rather than by lifting an entire basket. She also testified that she was able to perform some manual tasks using only her left arm.

Richardson admits, however, that even with those modifications she remained unable to perform a number of tasks, including mopping the floor, lifting heavy bags of trash, scooping ice cream, and unloading supplies from delivery trucks. She testified that "cooking was very hard for [her] to do with [her] arm" and that "[t]here was a lot of times when [she] would ask David [Carter, a cook,] for help with assisting [her] in anything to do with lifting." For example, she "would have him help [her] bring out the product so [she] could prep it, if it was too heavy. And he'd also end up having to put it back on the shelf." She also

suggested that she was unable to clean the Fry-o-lator thoroughly and that she was not able to carry bus buckets full of dirty dishes. Richardson's supervisor, Tina Emery, made similar observations: "[Richardson] couldn't take out the trash. She couldn't unload a truck. She couldn't refill our milk machine. She couldn't cook because she couldn't flip Fry-o-lator baskets."

Richardson also admitted in more general terms that her disability left her unable to perform a substantial number of manual restaurant tasks. When asked whether there were any unmentioned tasks for which she had to seek help, she replied, "I can't think of any right now, but I'm sure there was plenty. It's a restaurant." She reiterated the point in a colloquy with Friendly's attorney:

> Q: There's a lot of tasks you can do, but there's a lot of tasks you cannot do; is that correct?
>
> A: Well --
>
> Q: Right?
>
> A: I guess so.
>
> Q: Well you just told me a number you couldn't do; right?
>
> A: Right
>
> Q: And in a restaurant, there's a lot of those tasks that you cannot do with an arm that you shouldn't work overhead with, shouldn't be using repetitively, and shouldn't be lifting more than five pounds?

-23-

A: Yes.

Finally, she stated in her affidavit: "There were times that I felt that I was being required to do work beyond my work restrictions, typically in performing closing duties, only because I was scheduled with another individual, Angela Antonelli, who also was on light duty because she had restrictions related to bilateral wrist problems."

Richardson does not contest any of the foregoing evidence. Instead, she argues that the portions of her affidavit describing the manual tasks that she was able to perform raise a genuine issue of material fact as to her qualifications. We disagree. The number of tasks that Richardson was unable to perform was simply too great for her to be able to effectively perform her essential operational duties as assistant manager of a small restaurant like the Ellsworth Friendly's. We conclude that, on the facts of this case, no reasonable jury could find that Richardson was capable of performing her essential function of "assist[ing] in kitchen, dining and take-out operations to facilitate production and customer service."

## C. Richardson's Ability to Perform the Essential Functions of her Position with a Reasonable Accommodation

Richardson bears the burden of proving that a "proposed accommodation would enable her to perform the essential functions of her job" and that, "at least on the face of things, [the accommodation] is feasible for the employer under the

-24-

circumstances." Tobin v. Liberty Mut. Ins. Co. ("Tobin II"), 553 F.3d 121, 136 (1st Cir. 2009). Richardson argues that the only accommodation she needed was the ability to perform certain manual tasks in a modified manner. As we have already explained, it would be unreasonable for a jury to conclude that Richardson was able to perform her essential function of physically assisting with the restaurant's operations even when the modifications are taken into account.

Richardson also argues that, as a manager, it was reasonable for her to delegate certain manual tasks to other restaurant employees. That argument does not take her far. "[T]he law does not require an employer to accommodate a disability by foregoing an essential function of the position or by reallocating essential functions to make other workers' jobs more onerous." Mulloy, 460 F.3d at 153 (internal quotation marks and citations omitted). On the facts of this case, it would be unreasonable for Richardson to delegate so many tasks that she would no longer be performing her essential function of physically assisting with the restaurant's operations. Richardson must be able to perform a sufficient number of manual tasks on her own. As explained above, she has not shown that there is a genuine issue of material fact as to whether she can do that.

## D. Conclusion

Because Richardson has failed to present sufficient evidence for a reasonable jury to find that she is a "qualified individual" within the meaning of the ADA, her discriminatory discharge claim must fail.  See Phelps, 251 F.3d at 28.  We therefore have no reason to consider her argument that Friendly's reliance on the Family and Medical Leave Act as a reason for terminating her was pretextual.

## III.

In addition to pressing the discriminatory discharge claim, Richardson has argued that Friendly's violated the ADA by refusing to engage in an interactive process to determine whether any reasonable accommodations were available.  See 29 C.F.R. § 1630.2(o)(3); Tobin I, 433 F.3d at 108.  An interactive process claim cannot succeed unless the interaction could have led to the discovery of a reasonable accommodation that would have enabled the plaintiff to perform the essential functions of her position.  See Kvorjak, 259 F.3d at 53; Soto-Ocasio v. Fed. Express Corp., 150 F.3d 14, 19 (1st Cir. 1998).  As we have already explained, Richardson has not identified any such accommodation in her briefs. The two accommodations she has identified -- performing tasks in a modified manner and delegating tasks to other employees -- are, respectively, on this record, inadequate to enable her to perform a sufficiently broad range of manual tasks and unreasonable as a

-26-

matter of law.  Summary judgment was therefore properly granted on her interactive process claim.

**<u>AFFIRMED</u>**.